1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

KEVIN KENNISTON,

                                        Petitioner,

v.

J. MCDONALD, Warden,

                                        Respondent.

Case No.:  15cv2724 AJB (BGS)

**REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Petitioner Kevin Kenniston ("Petitioner" or "Kenniston"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCS247814.  (Pet. at 1, ECF No. 1 "Pet.")[1]  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

15cv2724 AJB (BGS)

Traverse, the lodgments, and all the supporting documents submitted by both parties. For the reasons discussed below, the Court **RECOMMENDS** the Petition be **DENIED**.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

A. Mendez Counts

Mendez testified she was 20 years old when she and defendant met in 2007. Mendez was then living with her parents. When they met, defendant told Mendez he owned his own "transportation company" and worked for the "government," although defendant told Mendez he was prohibited from giving her more specifics about his governmental work. About a month and a half after they met, Mendez and defendant became engaged. They married shortly thereafter and resided together in an apartment in Oceanside, California.

A few weeks later, Mendez became aware that the diamond in the wedding ring defendant had given her was fake. This caused Mendez to become suspicious of defendant because he previously had told her the diamond was real. Mendez confronted defendant about the diamond and about other things defendant had said, including that he owned his own home. Defendant initially insisted the diamond was real but subsequently admitted it was fake. When Mendez asked about the home defendant said he owned and asked to see it, defendant told Mendez he was selling it and did not have a key.

Just a few weeks after they began living together as a married couple, Mendez moved back to her parent's home because she and defendant were arguing. Mendez subsequently moved back in with defendant. After she returned, defendant became physically abusive.

/ / /

Mendez testified about an incident that occurred after they had argued. Defendant initially refused to let her leave their apartment or call her parents on her cell phone, which he disabled. Defendant next pushed Mendez up against the bedroom wall, put both of his hands around her neck and choked her for about 30 seconds. He also grabbed Mendez by the ankles a "couple of times" when she was on the bed and pulled her down to the floor.

Defendant then went to the kitchen, retrieved a "steak knife" and pointed it at Mendez. Mendez testified defendant then got on top of, and wrapped his legs around, her. Mendez asked defendant, "'Are you going to kill me or what are you going to do?'" and "'Really? Are you really going to do this?'" Mendez was afraid defendant would stab her. Defendant responded, "'You don't think I will?'" Scared, Mendez tried to be "nice" to defendant so that he would let her go. Defendant, in response, stabbed the pillow twice, missing Mendez's head by a "couple inches."

After defendant got off of Mendez, she ran to a neighbor's house and asked them to call police. While at the neighbors, she saw defendant outside letting the air out of her car tires. Mendez ran back to the apartment and tried to lock the door behind her. Defendant followed behind and pushed the door open.

When Mendez told defendant the police had been called, he said, "Let's go." Defendant then grabbed Mendez by the arm, walked her outside and forced her into his car. Mendez testified she was scared.

Defendant would not tell Mendez where they were going as he drove. Mendez repeatedly asked defendant to let her go. Finally, Mendez told defendant that if he let her go, she would not press charges against him. According to Mendez, defendant's demeanor then changed and he allowed Mendez to use his cell phone.

Mendez's sister met Mendez and defendant in a parking lot. Mendez's sister then drove Mendez to their parents' home, where Mendez took pictures of the bruises to her neck, arms and knees she received during the incident.

/ / /

Mendez testified defendant called the following day to apologize and to ask her to come home.  Mendez refused.  A few weeks later, defendant went to Mendez's parents' house, again apologized and asked Mendez to come home with him.  While there, defendant found Mendez's cell phone and deleted the pictures she had taken of her bruises from the steak knife incident.  Mendez was very upset when she discovered her pictures were gone.

About two weeks later, Mendez returned to defendant.  Although Mendez was cautious when she moved back into their apartment, she believed defendant had changed because he was being "really nice and sweet."  However, when Mendez heard a voicemail on defendant's phone from another woman, Mendez concluded defendant was cheating on her and asked for a divorce.

Mendez testified in early May 2007 defendant came to her parents' home with divorce papers for her to sign.  Mendez's mother was home with Mendez at the time.  After Mendez signed the papers, she went upstairs to get ready for work, believing defendant had left.  While in the shower, defendant came into her bathroom, opened the shower curtain and struck Mendez in the face and chest while accusing her of cheating on him.  Defendant then threw Mendez's car keys at her, striking her on the arm.

When police arrived, they took pictures of Mendez's face, which was red from the blows from defendant, and of her arm, which was scratched from the keys.  The next day, Mendez sought to obtain a restraining order against defendant.

In support of the restraining order, Mendez described not only the shower incident but also an incident involving defendant that occurred in late April 2007.  In the latter incident, Mendez had agreed to meet defendant at a fitness club after work.  After exercising, Mendez stopped at a convenience store.  When she came out of the store, defendant had used his car to block Mendez's car from leaving.  Defendant then started yelling, "Where were you?"  When Mendez replied she had been inside the store the entire time, defendant accused her of lying and of using the payphone outside the store to call another man.  Defendant then jumped onto the hood of Mendez's car, stomped on the windshield and shattered the glass while Mendez was inside.

A patrol officer testified he responded to a call in late April 2007 about 12:30 a.m. involving a family disturbance at a convenience store. The officer spoke to Mendez. His report confirmed the events Mendez described in support of her restraining order. The officer also testified Mendez said she did not want to press charges against defendant.

Despite the temporary restraining order, defendant called Mendez several times, including the "whole week" before defendant's scheduled court date resulting from the May 2007 shower incident. During one of those calls, defendant asked Mendez to go to court with him and testify that defendant had not hit her in the shower, as she had previously claimed. Mendez refused.

Mendez testified the restraining order did not stop defendant thereafter from continuing to contact her, including coming to her place of employment. Defendant complained to Mendez it was her fault he had to pay "fees" and take "anger management classes" as a result of the May 2007 shower incident. [Footnote 3: The record shows that as a result of the May 2007 shower incident, defendant plead guilty to misdemeanor battery on a spouse, in violation of section 243, subdivision (e)(1).]

B. Jessica G. Counts

Jessica G. testified she met defendant in April 2010. In the beginning of their relationship, defendant told Jessica G. and Jessica G.'s then 11-year-old daughter, Kylie, he owned a funeral escort business and, as a result, was authorized to stop traffic to allow a funeral procession to proceed uninterrupted. He also told Jessica G. a "hand[ful] of times" over the course of their relationship that he was a sworn police officer and had taken a course through the California Highway Patrol that authorized him "to stop people and write tickets."

Kylie testified defendant told her that he purchased a black and white car online and that he was allowed to pull people over like the highway patrol. Kylie also testified that defendant's car had roof-mounted lights, a siren and a loudspeaker; that defendant also had a police scanner inside, which he used to speak to other police officers; and that defendant told her he was then known as "the sergeant," and it was not illegal to listen to and talk on the police scanner "if you are a cop."

15cv2724 AJB (BGS)

Kylie testified defendant told her in the past he had ticketed people. Kylie saw defendant carry a gun when he wore his funeral escort uniform. Defendant told Kylie it was a "real gun."

Kylie testified about various incidents when defendant would pull over other motorists while she was riding as a passenger in his car. In one instance, defendant used the lights on the top of his car to pull over a motorist driving a "blue car" near a shopping center because the motorist, according to Kylie, had either run a stoplight or was going too fast. Defendant talked to the motorist but did not write a ticket because the motorist apologized.

In another incident, defendant used his car's flashing lights to pull over a yellow "sports car" for speeding on a freeway as he was driving Kylie to school. About five minutes later, defendant returned and told Kylie he did not ticket the motorist because he "left his ticket book at home. . . ." Kylie recounted another incident when defendant used his car's flashing lights to pull over a motorist on the freeway. Kylie testified this incident also occurred in the morning when defendant was driving her to school.

Kylie also testified about an incident involving a homeless man. As they were driving on a freeway, defendant said to Kylie, "'watch this.'" Defendant then slowed down and, over the loud speaker, told the homeless man, "'get off of my freeway.'" Kylie testified the man appeared afraid and quickly attempted to gather up his belongings. Defendant then told the man he would buy him a pizza if he picked up trash on the freeway.

Kylie testified about another incident when defendant used his car's flashing lights and siren to block a lane and divert traffic after they exited a freeway and saw a man out of his car looking in some bushes. Defendant pulled up to the man, who claimed to be looking for an item that had flown out of his car window. Defendant helped the man look for the item for about three minutes. When they could not find it, defendant demanded the man "get off the road."

Kylie testified that defendant was wearing his funeral escort uniform in at least one of these incidents and that she was afraid when defendant stopped motorists because a motorist might get angry "and come and try to hurt him or me." On one occasion, Kylie told defendant

he could not pull over people because he was not a "real cop." Defendant responded he had the "same powers as a cop."

Jessica G. testified that, shortly before she and defendant stopped dating, Kylie told her about an incident that occurred when defendant had been dropping Kylie off at school. As discussed in more detail *post*, defendant in this particular incident confronted a woman as she sat in her car parked in the school's loading zone. Kylie then told Jessica G. about the other incidents of defendant pulling over motorists when Kylie was a passenger in defendant's car. Jessica G. testified that she was "shocked" to learn her daughter had been in the car with defendant. Jessica G. confronted defendant and told him he was not allowed to pull people over. In response, defendant said, "'Yeah, I can.'"

Jessica G. testified the first incident of physical abuse by defendant occurred in June 2010 when defendant pushed her as he was taking away her cell phone. In another incident of abuse, Jessica G. testified defendant came to her home and wanted to talk. Because Jessica G. had just gotten off work, she got up to make herself a drink. Defendant did not want Jessica G. to drink so defendant "took the booze and . . . poured it out." Jessica G. in response said, "Why d[id] you do that? It is my condo. You can't just come over here and tell me what to do." Defendant responded by hitting Jessica G. in the solar plexus, knocking the wind out of her.

In another incident of abuse, after they had argued, defendant restrained Jessica G. in her home while Kylie and Kylie's friend were also at home. In this incident, defendant would not let Jessica G. go even though she was trying to get away from him.

Jessica G. testified about an incident that took place in early March 2011 after she and defendant argued. In this incident, defendant put his hands around her neck, after forcing her into a corner, and lifted her off the ground. After defendant calmed down, he let Jessica G. go and said, "'I am sorry. I am sorry. I didn't mean to do that. Let's just talk.'"

During the same general time frame as the March 2011 incident, defendant told Jessica G. he was contemplating leaving San Diego and taking a job as a "mercenary overseas." Defendant told Jessica G. that the job was "somewhere in Africa"; that it was dangerous and there was a "high chance of [him] getting KIA or killed in action"; but that the money was good and it was a good opportunity for him.

On or about March 16, 2011, Jessica G. invited defendant to stop by her home. At some point that evening, Jessica G. unexpectedly received a text from "Brad," an individual she previously had met while playing online video games. Jessica G. opened the message, looked at it and then erased it. When Jessica G. refused to tell defendant who had texted her, defendant took Jessica G.'s phone and left. Defendant later called Jessica G. and told her he had "chucked it [i.e., the phone] off the side of the road." The next day, while upstairs in her home, Jessica G. heard someone come through the front gate into her house and "plop" something on the counter. Jessica G. went downstairs and found the cell phone defendant had taken the night before.

On or about March 18, 2011, Jessica G. came home from work about 2:30 a.m. and found defendant waiting for her in his funeral escort car, which he had parked in front of her carport. Defendant told Jessica G. they needed to talk. Jessica G. reluctantly agreed. After Jessica G. told defendant she did not love him anymore, defendant said he had taken the mercenary job and was leaving the following day for Washington D.C., where he would pick up his "orders" and obtain his itinerary. Defendant returned the keys to Jessica G.'s home and left.

The following day, defendant sent Jessica G. various text messages, including one stating he was in the airplane and was about to take off and another of an aerial photo taken from inside an airplane. Defendant also called Jessica G. and left a message while on the airplane. Jessica G. testified in the message she could hear "airplane noise in the background." Defendant told Jessica G. he would call when he arrived at his hotel in Washington D.C.

On March 20, 2011, defendant sent Jessica G. a text message saying he would consider coming back to San Diego so they could get married and have children. Jessica G. respond[ed] defendant was crazy. During the day, defendant sent myriad additional text messages to Jessica G., including one accusing Jessica G. of "video fucking" Brad, one telling Jessica G., "you love only yourself," and another saying she drank too much.

The next day, defendant sent Jessica G. a text message apologizing for his behavior. He told Jessica G. that he would be leaving the following day to go overseas; that he would no longer be able to

communicate once he left; and that he would like her to call when she got off work.

Although Jessica G. got off work about 2:30 a.m., she spoke to defendant as she drove home. Once home, they hung up and Jessica G. began playing an online video game with Brad. As she was playing, defendant began to send Jessica G. text messages. When Jessica G. did not respond, defendant sent Jessica G. a message, "Say hi to Brad," and moments thereafter, another message, "for me." When Jessica G. still did not respond, Jessica G.'s landlines starting ringing even though it was after 3:00 a.m. and Kylie was sleeping. Defendant then left a message on Jessica G.'s answering machine that his employer was considering sending him back to San Diego.

A few minutes later, Jessica G. heard a "clicking" noise at the front door. Defendant suddenly came "storming" through her front door, silently approached Jessica G. and then went to her gaming console and turned it off. Believing defendant was in Washington D.C. and was leaving from there to go overseas, Jessica G. testified she was shocked to see defendant and asked him how he got inside her apartment. Defendant told Jessica G. he used his "special forces training" to pick her locks "with twigs."

Defendant next started looking through the text messages on Jessica G.'s cell phone. When Jessica G. tried to take her phone back, defendant grabbed Jessica G. and applied pressure so that she was unable to move her arm. As defendant twisted Jessica G.'s arm, she lost her balance and fell to the floor. Defendant got on top of Jessica G. and used his weight and knees to pin her down as he continued looking through her phone messages. When Jessica G. said she was not doing anything wrong, defendant told Jessica G. to shut up and used the back of his hand to slap Jessica G., grazing her face.

Defendant next came across a text message where Brad had called Jessica G. "darling." Defendant leaned forward, got within a few inches of Jessica G.'s face and said, "'Do you know what the word betrayal means?'"

Jessica G.'s cell phone starting ringing. When Jessica G. did not pick up, Brad sent Jessica G. a text message saying he had called the police. Jessica G. remained curled in a ball on the floor as her phone rang

again.  Despite defendant's demands, Jessica G. refused to answer the phone and say everything was fine.

Shortly thereafter, defendant saw the police outside of Jessica G.'s home.  He told Jessica G. he could go to jail unless she told them everything was okay between them.  Jessica G. did not respond.  Defendant then threatened to destroy Jessica G.'s business and job.

Jessica G. testified defendant tried to be "chummy" with the police when he opened the front door and said, "'Hey, guys. How is it going?'"  After speaking to Jessica G., however, the police arrested defendant.  The officers later returned three keys to Jessica G. they had found on defendant, including a spare car key and two keys to her home.  A few days later, Jessica G. obtained a restraining order against defendant after he was released on bail after being charged with assaulting Jessica G.

In mid-April 2011, with the temporary restraining order still in effect, defendant called Jessica G. and said he wanted to apologize.  During their conversation, defendant acknowledged the restraining order prevented him from contacting Jessica G.

Jessica G. testified the following day she saw defendant in his car traveling in the opposite direction.  In her rearview mirror, she saw defendant make a U-turn and follow her into a grocery store parking lot.  Defendant stopped about 10 to 15 feet from where Jessica G. had parked.  Defendant said he wanted to have coffee, "com[e] clean" and tell Jessica G. about his "real past."  Jessica G. responded, "'You got to be fucking kidding me.'"  Jessica G. called the police.

A police officer testified he and another officer went to defendant's home later that evening, knocked on the door and saw a man in pajamas come downstairs and then go back upstairs.  According to the officer, when the same man returned downstairs, he was wearing jeans and tennis shoes.  The officers waited outside until they were let into the home by another of its occupants.  The officer testified the back door of the home was open, and the man was gone.  Jessica G. testified she was scared when police called her at work about 9:30 p.m. that night informing her that defendant had evaded arrest.

///

Shortly after receiving that call from police, Kylie called Jessica G. and said, "'Mommy, he is here,'" "'He is outside.'"  When Jessica G. asked who was outside, Kylie said she thought it was defendant.  Kylie was crying and could barely talk.  Kylie told her mother she heard knocking on the sliding glass door of their home and then heard the front door "jiggle."  Jessica G. told Kylie to hang up and call 911.  The phone line then went dead.

Jessica G. testified she was afraid defendant would break into her home and take Kylie hostage.  Jessica G. attempted to contact Kylie, but the phone line was busy.  Jessica G. called 911.  Police arrested defendant the following morning.

C.    Impersonation/Child Endangerment Counts

The record shows defendant was charged in counts 7-10 and 12-22 of impersonating an officer/child endangerment.  [Footnote omitted.]  The record shows Kylie was also riding in defendant's car in connection with count 8, summarized below.

1.    Counts 8 and 13-22

With respect to count 8, in early March 2011 Lisbeth Figueroa dropped off two of her children at school and then remained in a yellow unloading zone in her car while she talked on her phone.  As she sat, she saw in the rearview mirror flashing lights behind her from what appeared to be a police car.  She then heard someone say over a loudspeaker, "'Please move your vehicle. This is not a parking zone.'"  Figueroa noticed the lights were all yellow even though the car was black and white and looked like a police car.

The driver of the car, later identified as defendant (who was dropping Kylie off at school), again demanded that Figueroa move her car.  When she did not move, the man pulled alongside and Figueroa noticed the words "funeral escort" written on the car door.  The man told Figueroa the registration tag on her vehicle was expired and either she had to move her car or he would have it towed.  The man also demanded Figueroa's driver's license and car registration.

///

11

Figueroa explained she had been unable to go to the DMV to renew her car's registration. After Figueroa told the man she worked in security, the man's demeanor changed. He introduced himself as "Kevin" and told Figueroa he had a friend who worked at the DMV who could help Figueroa. Figueroa later reported this incident to the school police officer.

Counts 13-22 charged defendant with impersonating an officer/child endangerment specifically relating to the incidents, summarized *ante*, when Kylie was riding as a passenger in defendant's car.

## 2.    Counts 9, 10 and 12

The record shows count 9 charged defendant with impersonating an officer on or about July 16 and 17, 2010 (victim Jessica G.). Defendant was charged in count 10 with impersonating an officer between June and August 2010 (victims Ivan Fernandez and Nichole Ballesteros). [Footnote 5: The record shows that while driving in June or July 2010, Fernandez accidently cut off whom he believed was a motorcycle officer. The "officer" made a U-turn, turned on a siren and pulled over Fernandez, who had just picked up Ballesteros. The "officer," later identified as defendant, was wearing a uniform, helmet, badge and a belt typically worn by a sworn police officer. The "officer" made Fernandez get out of his car and sit on the curb. The "officer" subsequently let Fernandez go, but, before doing so, made him drive back to Ballesteros's house to apologize to Ballesteros's mother.] Count 12 charged defendant with impersonating an officer in early December 2008 (victim Candice Hodge).

(Lodgment No. 5 at 4-17.)

## III.    PROCEDURAL BACKGROUND

On May 23, 2011, a grand jury charged Kenniston by indictment with 32 counts: kidnapping (count one) (Cal. Penal Code § 207(a)); false imprisonment for purpose to avoid arrest (count two) (Cal. Penal Code § 210.5); attempting to dissuade a witness from reporting a crime (count three) (Cal. Penal Code § 136.1(b)(1)); false imprisonment by violence or menace (count four) (Cal. Penal Code §§ 236 and 237(a)); battery of a current of former significant other (count five) (Cal. Penal Code § 243(e)(1)); petty theft with

1    three priors (count six) (Cal. Penal Code §§ 484 & 666(a)); child abuse (count 18) (Cal.

2    Penal Code § 273a); stalking with court order in effect (count 23) (Cal. Penal Code §

3    644.9(b)); 11 counts of impersonating an officer (counts 7-13, 15, 17, 20 and 22) (Cal.

4    Penal Code § 146a(b)(1)(2)); five counts of cruelty to a child by endangering health

5    (counts 14, 16, 19, 21, 32) (Cal. Penal Code § 273a(b)); four counts of violation of a

6    protective order, domestic violence or elder abuse (counts 25, 27, 29, 31) (Cal. Penal

7    Code § 166(c)(1)); and four counts of disobeying a court order (counts 25, 27, 29, 31)

8    (Cal. Penal Code § 273.6(a)).  (Lodgment No. 1, vol. 1 at 1-12.)

9    As to counts 7-13, 15, 17, 20 and 22, it was further alleged that during the

10   commission of those offenses, Petitioner willfully impersonated a peace officer (Cal.

11   Penal Code § 538d).  (Lodgment No. 1, vol. 1 at 3-8.)   It was further alleged as to count

12   23 that the offense was committed while Kenniston was released from custody on bail

13   (Cal. Penal Code § 12022.1(b)).  Finally, it was alleged that Petitioner suffered four

14   prison priors (Cal. Penal Code §§ 667.5(b) & 668).  (Lodgment No. 1, vol. 1 at 8-9.)

15   The trial court dismissed counts 11, 24 and 25 prior to trial.  (Lodgment No. 1, vol.

16   5 at 983; *see also* Lodgment No. 2, vol. 1 at 28-29.)  In addition, on October 30, 2012, the

17   court granted the prosecution's motion to dismiss count 12.  (Lodgment No. 1, vol. 5 at

18   1030; Lodgment No. 2, vol. 13 at 1282-83.)

19   Opening statements in Kenniston's jury trial began on November 5, 2012.

20   (Lodgment No. 2, vol. 15 at 1371.)  On November 28, 2012, the jury found Petitioner

21   guilty on counts 1-6, 8, 10, 15, 16, and 18-29.  (Lodgment No. 1, vol. 5 at 1115-16; *see*

22   *also* Lodgment No. 2, vol. 30 at 4885-91.)  In addition, as to counts 8, 10, 15, 20 and 22,

23   the jury found the Cal. Penal Code § 538d(c) allegations to be true.   The jury further

24   found that count 23 was committed while Petitioner was out of custody on bail (Cal.

25   Penal Code § 12022.1(b)).  (Lodgment No. 1, vol. 5 at 1115-16; Lodgment No. 2, vol. 30

26   at 4887-91.)   The jury found Petitioner not guilty on counts 7, 9, 13, 14, 17 and 30-32,

27   and that the section 538d allegations with regard to counts 7, 9, 13 and 17 to be not true.

28   (Lodgment No. 1, vol. 5 at 1115-16; Lodgment No. 2, vol. 30 at 4886-92.)  Kenniston

waived his right to a bench trial on his priors, and admitted the alleged prison priors. (Lodgment No. 2, vol. 30 at 4895-4900.)  On May 3, 2013, the trial court sentenced Petitioner to 23 years and four months in prison.[2]  (Lodgment No. 1, vol. 5 at 1153; Lodgment No. 2, vol. 32 at 5515.)

On December 31, 2013, Kenniston, represented by appointed counsel, appealed the judgment to the California Court of Appeal arguing (1) his due process rights were violated when the trial court refused to sever the charges, (2) the trial court improperly denied Kenniston's request to substitute retained counsel for appointed counsel; (3) his due process rights were violated when the prosecutor made improper comments to the jury; and (4) his right to effective assistance of counsel was violated when defense counsel failed to object to the prosecutor's improper comments.  (*See* Lodgment No. 3.)

On September 2, 2014, Kenniston submitted a "Supplemental Brief" to the appellate court, on his own behalf.  (ECF No. 8 at Ex. A, 22-53.)  In it, Petitioner argued the prosecutor failed to turn over exculpatory evidence (grounds one and three), there was insufficient evidence to support counts  1, 15, 18-20 and 22 (grounds two, four and seven), the court erred in permitting expert testimony (ground five) and the prosecutor committed misconduct during closing argument (ground six).  (*See id.* at 23.)  In a letter dated September 8, 2014, the California Court of Appeal informed Petitioner that his pro se supplemental brief was being forwarded to his appellate counsel to determine what, if any, action should be taken.  (*Id.*, Ex. B at 56.)

/ / /

_____

[2] The court sentenced Kenniston to eight years on count one.  As to count two, the court imposed a term of one year and eight months, but stayed the sentence under California Penal Code section 654.  On counts three, four and six, Petitioner was sentenced to eight months on each count.  The court imposed a term of one year each for counts 8, 10, 15, 20 and 22. Petitioner received a 16 months on count 18, a one year sentence on count 23 and a two years for the section 12022.1(b) allegation.  In addition, the court imposed one year each for the four prison priors.  As to counts 5, 16, 21, 26 and 26, the court granted time served concurrent with count one and struck count 19.  (Lodgment No. 1, vol. 5 at 1150-52; Lodgment No. 2, vol. 32 at 5512-15.)

1    On September 19, 2014, the appellate court affirmed Kenniston's conviction in an

2    unpublished opinion.  The court addressed only the claims raised in the brief submitted

3    by Kenniston's appellate counsel.  (*See* Lodgment No. 5.)

4    On October 20, 2014, Kenniston submitted a "supplemental brief" to the California

5    Supreme Court, to which he appears to have attached the supplemental brief he had

6    attempted to submit to the Court of Appeal.  (*See* Lodgment No. 6.)  On October 27,

7    2014, appellate counsel for Kenniston filed a petition for review, raising the same four

8    claims as those presented to the appellate court.  (Lodgment No. 7.)  On December 10,

9    2014, the California Supreme Court issued an order stating "The Petitions for review are

10    denied."  (Lodgment No. 8.)

11    Kenniston, proceeding pro se, filed the instant federal petition for writ of habeas

12    corpus on December 4, 2015.  (ECF No. 1.)  In it, Petitioner raises ten claims.  (*See id.*)

13    Petitioner filed a Motion for Stay on January 4, 2015.  (ECF. No. 8.)  Respondent filed an

14    Answer on February 11, 2016.  (ECF No. 10.)  Kenniston filed a Traverse on March 14,

15    2016.  On April 26, 2016 the Court denied Petitioner's stay motion without prejudice to

16    filing an amended Motion for Stay.  (ECF No. 16.)  On June 13, 2016, Kenniston filed an

17    Amended Motion for Stay.  (ECF No. 18.)  Finally, on October 3, 2016, Petitioner filed a

18    "Notice of Exhaustion."  (ECF No. 19.)

19    In his "Notice of Exhaustion," Kenniston's stated that while his federal petition has

20    been pending before the Court, he has been seeking habeas review in the state courts.

21    Petitioner filed a petition for writ of habeas corpus in San Diego Superior Court on

22    December 7, 2015.  (*See* Notice, ECF No. 19, Ex. A at 22.)  In it, he raised 10 claims.

23    (*See id.* at 23-30.)  On February 19, 2016, the San Diego Superior Court denied his

24    habeas petition in a reasoned decision.  (*See id.*)  Kenniston then filed a petition with the

25    California Court of Appeal, raising the same 10 claims.[3]  (*Id.*, Ex. B at 32-62.)  The

26    _____

27    [3] Kenniston submitted the document as a "Petition for Review" of the superior court's decision.
The appellate court, however, construed the petition as an original proceeding.  (*See* Notice,

28    ECF No. 19, Ex. C at 64.)

appellate court denied the petition in a reasoned decision on April 26, 2016.  (*Id.* at 64-65.)   Finally, Kenniston filed a petition for writ of habeas corpus in the California Supreme Court on June 27, 2016, which was denied without comment or citation on September 14, 2016.[4]  (*See id.* at 5.)

On February 3, 2017, this Court denied Kenniston's motion for stay as moot. (ECF No. 20.)

## IV.    SCOPE OF REVIEW

Kenniston's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record."  *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

/ / /

---

[4] Although Petitioner did not submit a copy of the Supreme Court's decision, a search of the court's docket reveals that the petition was denied without comment or citation.  (*See* http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist =0&doc_id= 2147723&doc_no=S235484.)

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at

8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V.    DISCUSSION

Kenniston raises ten claims in his Petition: (1) his due process rights were violated when the state failed to turn over information about a prosecution witness; (2) his due process rights were violated because there was insufficient evidence to support his kidnapping conviction; (3) his due process rights were violated when the trial court permitted expert witness testimony and the prosecution failed to provide discovery regarding the expert witness; (4) his due process rights were violated because there was insufficient evidence to support his conviction on counts 15 and 20; (5) his due process rights were violated because there was insufficient evidence to support the true findings on the allegations for impersonating a peace officer while committing a felony, pursuant to California Penal Code §§ 538d & 667.17 (counts 8, 10, 15, 20 and 22); (6) his due process rights were violated because there was insufficient evidence to support his convictions on counts 18 and 19; (7) his due process rights were violated when the prosecution failed to provide exculpatory documents to the defense; (8) his due process rights were violated by the failure to sever the charges against him; (9) his right to counsel was violated when the trial court denied his request for a continuance in order to substitute retained counsel; and (10) his Sixth Amendment rights were violated when he received ineffective assistance of both trial and appellate counsels. (*See* Pet., ECF No. 1-1 at 1-100, ECF No. 1-2 at 1-97.)

### A.    <u>Exhaustion of State Court Remedies</u>

In the Answer, Respondent argues claims one through four, six and seven are unexhausted because Petitioner failed to "fairly present" them to the California Supreme Court. (*See* P. & A. Supp. Answer, ECF No. 10-1 at 8-10.) Habeas petitioners who wish

to challenge either their state court conviction or the length of their confinement in state prison, must first exhaust state judicial remedies.  28 U.S.C. § 2254(b), (c); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987).  To exhaust state judicial remedies, a California state prisoner must present the California Supreme Court with a fair opportunity to rule on the merits of every issue raised in his or her federal habeas petition.  28 U.S.C. § 2254(b), (c); *Granberry*, 481 U.S. at 133-34; *see also Duncan v. Henry*, 513 U.S. 367, 365 (1995).  If the claim was not presented to the state's highest court on direct appeal, state collateral remedies must be exhausted.  *Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986).  For a petitioner in California state custody, this generally means that the petitioner must have fairly presented his or her claims in a petition to the California Supreme Court.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (interpreting 28 U.S.C. § 2254(c)); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999) (applying *O'Sullivan* to California); *accord Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

As noted above, Kenniston raised claims one through four, six and seven in a pro se "supplemental" brief submitted to the California Court of Appeal in conjunction with his direct appeal.  (*See* ECF No. 8, Ex. A at 22-53.)  The appellate court informed Kenniston by letter that the supplemental brief was being forwarded to his appointed appellate attorney, who had already filed a brief on Kenniston's behalf.  (*See id.*, Ex. A at 23.)  Petitioner's pro se supplemental brief was not filed and the appellate court's opinion affirming Kenniston's conviction addressed only those claims raised in the brief filed by appellate counsel.  (*Id.*, *see also* Lodgment No. 5.)

Kenniston then submitted a "supplemental brief" to the California Supreme Court, along with a petition for review filed by his appellate counsel.  (*See* Lodgment Nos. 6 & 7.)  The supplemental brief was filed, but it appears the supporting exhibits were returned to Kenniston.   The California Supreme Court ultimately issued an order stating "The Petitions for review are denied."  (Lodgment No. 8.)

Respondent argues that despite Kenniston's efforts to raise claims one through four, six and seven in the California Court of Appeal and the California Supreme Court,

the supplemental brief raising the claims was never filed in the appellate court.  Under California Rules of Court, the California Supreme Court will normally not consider issues that petitioner failed to timely raise in the appellate court.  Cal. R. Ct. 8.516(b)(1).  Therefore, Respondent argues, because the supplemental brief was not filed in the appellate court, the claims raised therein were not "fairly presented" to the California Supreme Court.  As such the claims are unexhausted.  (*See* P. & A. Supp. Answer, ECF No. 10-1 at 9-10.)

After Respondent filed his Answer, however, Petitioner filed a motion to stay the proceedings so that he could return to state court and properly exhaust his state court remedies as to all claims.[5]  On October 3, 2016, Petitioner filed a Notice of Exhaustion, which established that Petitioner had presented all claims to the California Supreme Court.  (ECF No. 19.)  On February 3, 2017, this Court concluded that Petitioner's claims were exhausted and denied Petitioner's motion for stay as moot.  (ECF No. 20.)  Accordingly, the Court will address the merits of all ten claims.

## B.    *Brady* Violations (Claims One and Seven)

In grounds one and seven of the Petition, Kenniston argues his due process rights were violated when the prosecutor failed to turn over exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 82 (1963).  In ground one, he asserts the prosecutor failed to notify the defense regarding statements prosecution witness Esmeralda Mendez purportedly made after the trial ended.  (Pet., ECF No. 1-1 at 5-9.)  He also claims that

---

[5]  Petitioner filed a petition for writ of habeas corpus in San Diego Superior Court on December 7, 2015.  (*See* Notice, ECF No. 19, Ex. A at 22.)  In it, he raised the same 10 claims as those presented in his federal petition.  (*See id.* at 23-30.)  On February 19, 2016, the San Diego Superior Court denied his habeas petition in a reasoned decision.  (*See id.*)  Kenniston then filed a petition with the California Court of Appeal, raising the same 10 claims on April 7, 2016.  (*Id.*, Ex. B at 32-62.)  The appellate court denied the petition in a reasoned decision on April 26, 2016.  (*Id.* at 64-65.)  Finally, Kenniston filed a petition for writ of habeas corpus in the California Supreme Court on June 27, 2016, which was denied without comment or citation on September 14, 2016.  (*See* http://appellatecases.courtinfo.ca.gov/search/case/main CaseScreen. cfm?dist =0&doc_id= 2147723&doc_no=S235484.)

15cv2724 AJB (BGS)

the prosecution knowingly relied on perjured testimony from Mendez. (*Id.* at 9.) In ground seven, Kenniston argues the prosecution failed to turn over evidence of an investigation of Petitioner conducted by Chula Vista Police to the defense. (Pet., ECF No. 1-2 at 33-37.)

As discussed above, Kenniston raised these claims in a petition for writ of habeas corpus to the California Supreme Court, which was denied without comment or citation. Thus, this Court "looks through" to the last reasoned decision to address these grounds, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. In denying both claims, the appellate court stated:

> Kenniston raises two claims that the prosecution failed to produce exculpatory evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83. The prosecution has a duty to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment. (*In re Miranda* (2008) 43 Cal. 4th 541, 575.) Evidence is material if there is a reasonable possibility that, had it been disclosed to the defense, the result of the trial would have been different. (*Ibid.*) "Such a probability exists when the undisclosed evidence reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Ibid.*)

> Kenniston admits, however, that he does not know what information the prosecution allegedly did not disclose, but merely suspects the existence of such information. His claim is entirely speculative and Kenniston fails to demonstrate the materiality of the alleged undisclosed information. Thus, he does not establish a basis for relief.

(*See* Notice, ECF No. 19, Ex. C at 65.)

### 1.    *Evidence Regarding Mendez's Testimony (Ground One)*

Petitioner argues his due process rights were violated when, after trial, Mendez contacted an employee of the District Attorney's office and provided "additional information" which was not turned over to the defense. (Pet., ECF No. 1-1 at 5-9.) He

/ / /

/ / /

further contends Mendez gave false testimony.  He argues his due process rights were violated because the prosecution knowingly relied on perjured testimony from Mendez. (*Id.* at 9.)

Some background on Mendez's testimony is necessary first.  Mendez was Kenniston's former wife.  (Lodgment No. 2, vol. 18 at 1820.)  She testified before the grand jury once and at trial on two occasions regarding her relationship with Kenniston and, in particular, an incident which occurred a few weeks after they married and moved in together.  Mendez's trial testimony regarding the incident provided the evidentiary basis for counts one and two against Kenniston.  (*See generally* Lodgment No. 1, vol. 1 at 1.)

On November 8, 2012, the day Mendez was scheduled to testify at Kenniston's trial, an investigator in the District Attorney's office picked Mendez up at her home and drove her to the courthouse.  During the drive, Mendez told the investigator she did not want to testify.  (Lodgment No. 2, vol. 18 at 1731-32, 1747-48.)  Mendez stated that she suffered from anxiety and panic attacks.  She said she had forgiven Kenniston and did not want to relive the incident.  She also told a district attorney investigator that if called to testify, she would "take the Fifth."  (*Id.* at 1757, 1761-62.)  After arriving at the courthouse, Mendez was in the hallway with two employees from the District Attorney's office, waiting to be called to testify, when she appeared to experience a panic attack. (*Id.* at 1730, 1780-81.)  She asked the investigator to inform the court she wished to be excused from testifying for medical reasons.  (*Id.* at 1731-32.)

The court held a hearing outside the presence of the jury to determine whether Mendez was medically competent to testify.  (*See id.* at 1747-53, 1759-68.)  The court also sought to determine what Mendez meant when she told investigators she would "plead the Fifth."  During the hearing, Mendez stated that she did not want to testify at trial because of her anxiety.  (*Id.* at 1748-49.)  She further stated that she did not want to "relive everything that happened" and that she forgave Kenniston.  (*Id.* at 1750.)

/ / /

When asked by the prosecutor about her comment to the investigator that she would "plead the Fifth," Mendez stated that she would do so because she did not want to testify, "not because she thought she had committed any sort of criminal offense." (*Id.* at 1765.)  Although Mendez denied the existence of any self-incrimination issue, the court, in an abundance of caution, appointed counsel to represent Mendez regarding any potential Fifth Amendment issues. (*Id.* at 1785-86.)   After meeting with Mendez, her appointed counsel reported to the court that he did not believe there was any Fifth Amendment issue and that it was simply matter of Mendez not wanting to testify. (*Id.* at 1817-18.)  He stated that Mendez had erroneously believed that "pleading the Fifth" simply meant she would not have testify and she was unaware that it applied specifically to self-incriminating testimony.  He stated that Mendez now understood that she had to testify and would comply. (*Id.*)  Although Mendez's attorney stated that she was "adamant" that she had not lied during her grand jury testimony or any prior proceedings, the prosecutor agreed to grant Mendez immunity in order to avoid any potential Fifth Amendment issues, in the event it came to light she had perjured herself at any time during the proceedings. (*Id.*)

Shortly thereafter, Mendez took the stand to testify before the jury.  It is clear from the record that she was anxious and hesitant during her testimony.  She often had difficulty remembering specific details and her memory had to be refreshed with her grand jury testimony numerous times.  Nonetheless, Mendez's testimony was generally consistent with her grand jury testimony.  Specifically, she testified that in 2007, some weeks after moving in with Petitioner, the two had an argument at their apartment.  She attempted to leave to go to her parents' home but Kenniston blocked the door. (*Id.* at 1854.)  When she tried to push past Petitioner, he became violent.  At one point, Kenniston pushed her against a wall and grabbed her around the neck with both hands,

/ / /

/ / /

/ / /

choking her.  (*Id.* at 1851-52, 1854, 1858.)  At another point,[6] Kenniston pulled her off the bed by her ankles.  (*Id.* at 1860-61.)  When Mendez tried to call her parents, Petitioner took her phone away.  (*Id.* at 1862.)  While she was on the bed, Kenniston went to the kitchen, got a knife and returned to the bedroom.  He got on top of Mendez and pointed the knife at her.  After threatening her with the knife, Kenniston stabbed the pillow twice, inches away from Mendez's head.  (*Id.* at 1865-67.)

Ultimately, Mendez was able to free herself and flee the apartment.  She went to her neighbors' apartment and asked them to call the police.  (*Id.* at 1870.)  When she looked outside, she saw Kenniston in the parking lot letting the air out of her automobile's tires.  (*Id.* at 1873.)  She tried to return to her apartment but before she could lock the door, Petitioner pushed his way in.  (*Id.* at 1875-76.)  She told Kenniston the police had been called and he responded that they had to leave in order to avoid the police.  (*Id.* at 1876.)  She did not want to go; she wanted to stay and wait for the police to arrive.  (*Id.* at 1877, 1879.)  Kenniston grabbed her by the arm, led her to the parking lot and forced her into his car.  (*Id.* at 1878.)  Once in the car, Kenniston drove fast out of the parking lot.  Mendez testified that she was scared and did not know where Petitioner was taking her.  She asked Petitioner several times to let her go and told him that if he did, she would not press charges.  (*Id.* at 1897-88.)  Eventually Kenniston calmed down and finally let her use his phone to call her family.  He ultimately dropped her off in a grocery store parking lot.  Mendez's sister picked her up and took her to her parents' house.  (*Id.* at 1890.)

On cross-examination, defense counsel asked Mendez if she had been drinking on the day of the incident.  She replied that she did not remember drinking that day.  (*Id.* at 1966-67.)  At the end of re-direct, Mendez stated that she had been truthful in her testimony to the best of her abilities.  (*Id.* at 2015.)

---

[6] During her trial testimony, Mendez had difficulty remembering the exact order of events that took place in the apartment.  (*Id.* at 1860.)

After her testimony on November 8 and 9, 2012, Mendez was re-called to testify on November 20, 2012, when a transcript of her grand jury testimony was admitted into evidence. (*Id.*, vol. 26 at 3036.) She testified on November 20 that she had had a "flashback" after her initial trial testimony. During the flashback, she remembered that "the day [Kenniston] took me in his car, we were [both] drinking." (*Id.* at 3036-37.) She reiterated, however, that she had not wanted to be taken from the apartment by Kenniston. (*Id.* at 3048.)

After the trial concluded, but before sentencing, Mendez spoke to an investigator for Petitioner's defense counsel. (*See* Pet., Exs. B & C, ECF No. 1-2 at 103-07.) According to the investigator's reports, Mendez told her she did not think Kenniston had kidnapped her. Mendez also reiterated that she had been drinking on the day of the incident, contrary to her testimony before the grand jury and her first time testifying at trial. (*See id.* at 103.) Soon thereafter, defense counsel filed a motion for a new trial based, in part, on this "additional and new evidence." (Lodgment No. 1, vol. 4 at 930-31.)

In a sworn affidavit obtained by defense counsel and filed in support of the motion, Mendez stated that after she testified for the final time on November 20, 2012, she spoke to an employee at the District Attorney's office and provided "additional information" that she had forgotten during her original testimony. (Pet., Ex. A, ECF No. 1-2 at 101.) She also stated that she wanted leniency for Kenniston at sentencing because she had forgiven him. (*Id.*)

In his federal Petition, Kenniston argues that his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) were violated because the prosecutor did not inform the defense that Mendez had provided "additional information" after her November 20, 2012 testimony. (Pet., ECF No. 1-1 at 11.) In *Brady*, the Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Although this

rule originally covered only exculpatory evidence, the Supreme Court has extended it to include impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

In order to establish a *Brady* violation, a defendant must show three things: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently, (2) the withheld evidence was either exculpatory or impeachment material, and (3) the evidence was material to the defense. *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *Bagley*, 473 U.S. at 676, 678). Evidence is material under *Brady* only if there is a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). A "reasonable probability" means a probability "sufficient to undermine confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682; *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (the defendant must show that the government's suppression of the evidence undermines confidence in the trial's outcome).

Even assuming arguendo that the prosecutor withheld information regarding a conversation between a District Attorney investigator and Mendez, Petitioner cannot establish a *Brady* violation because he has not shown the purported evidence was exculpatory or impeachment evidence, or that any such evidence was material. Mere supposition as to what a witness told prosecutors cannot support a *Brady* claim. *Runningeagle v. Ryan*, 686 F.2d 758, 770 (9th Cir. 2012). As the California appellate court noted, Kenniston only speculates that the "additional information" Mendez purportedly provided to the prosecution would have been favorable to the defense. (*See* ECF No. 19, Ex. C at 65.) In her signed affidavit, Mendez states only that she "talked more about the incident and how Mr. Kenniston returned me" with an employee at the District Attorney's office. (Pet., Ex. A, ECF No. 1-2, at 101.) No specifics are offered in Mendez's affidavit regarding the nature of the "additional information." As such, Petitioner has not established that the evidence was favorable, much less material, to the defense. *See Runningeagle*, 686 F.2d at 770; *see also Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting *Brady* claim as too speculative).

Kenniston points to reports of a defense investigator regarding conversations she had with Mendez in February and March 2013, arguing they suggest Mendez provided favorable evidence to the prosecution.  Specifically, during the March interview, Mendez reportedly told the defense investigator she had been drinking on the day of the incident, Kenniston did not want her to drive because she was drunk, and Mendez did not think Kenniston had kidnapped her.  (*See* Pet., ECF No. 1-2, Ex. C at 107.)  However, the defense investigator reports are not sworn affidavits, and as such they were not admitted by the state trial court.  *See People v. Pic'l*, 171 Cal. Rptr. 106, 137-38 (Cal. App. 1981) (holding a motion for a new trial based on newly discovered evidence must be decided "solely upon affidavits" and a trial court is prohibited from hearing witness testimony at an evidentiary hearing); *see also* Cal. Penal Code § 1191(8).

Furthermore, Mendez herself failed to corroborate the statements in her own affidavit.  She states only that she provided "additional information."  As discussed above, Mendez did not offer any specifics as to what that information included. Moreover, there is nothing in the defense investigator's reports concerning any new information relayed to the prosecutor, or the defense investigator, for that matter.  Indeed, there is no mention of any post-trial communication between Mendez and anyone from the District Attorney's office in either report.  (*See* Pet., ECF No. 1-2, Exs. B & C at 103-07.)

Finally, to the extent there is any favorable information contained in the defense investigator's reports, it is not inconsistent with evidence already presented to the jury. When she returned to testify the second time about her "flashback," Mendez stated on cross-examination that she had been drinking on the day of the incident and Kenniston did not want her to drive, contrary to her previous grand jury and trial testimony.[7] (Lodgment No. 2, vol. 26 at 3036-37.)  Thus, even if this Court could consider the

_____

[7] The jury also heard testimony that she did not want to go with Kenniston that day, and that she had begged Kenniston to let her out of the car.  (Lodgment No. 2, vol. 26 at 3049.)

15cv2724 AJB (BGS)

reports, there is nothing contained in them to establish the prosecutor failed to turn over evidence. Moreover, as discussed above, Petitioner has not shown that any such evidence was material under *Brady*. Therefore, this Court concludes the state court's denial of Petitioner's *Brady* claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08.

Petitioner further argues in ground one that the prosecutor knowingly relied on "faulty and perjured testimony provided by Mendez to convict Petitioner." (Pet., ECF No. 1-1 at 10.) He claims the statements purportedly made by Mendez to the defense investigator provide "proof of perjury." (*Id.* at 9.)

"The knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959). However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002). To prevail on such claims, three things are required: (1) the testimony or evidence must be false, (2) the prosecution must have known or should have known it was false, and (3) the false testimony must be material. *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).

A witness testifying under oath commits perjury if she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Not every discrepancy in testimony translates into perjury. *Lambert v. Blackwell*, 387 F.3d 210, 249 (3d Cir. 2004). The presentation of a conflicting version of events does not establish the prosecutor's knowing use of perjured testimony. Falsity is not established merely by showing that the witness made an earlier inconsistent

statement, or that the witness's testimony differs from that of another witness. *See Zuno-Arce*, 44 F.3d at 1423; *see also Geston*, 299 F.3d at 1135. "Discrepancies in testimony . . .could as easily flow from errors in recollection as from lies." *Zuno*-Arce, 44 F.3d at 1423.

Here, there is nothing to suggest the prosecution had reason to believe Mendez perjured herself. As discussed above, when she returned to testify the second time at trial, on November 20, Mendez offered some information that was inconsistent with her grand jury and initial trial testimony. She stated that since testifying on November 8 and 9, she had a flashback during which she remembered drinking on the day of the incident. Nonetheless, nothing in Mendez's testimony supports the argument that the prosecutor knew her previous testimony was perjurous. Indeed, all of Mendez's statements suggest the contrary. She testified that she only remembered drinking after her initial trial testimony. (Lodgment No. 2, vol. 26 at 3036-37.) After trial, when Mendez spoke to defense investigator about her trial testimony, she repeatedly stated that her trial testimony was true to her recollection when she gave it, and that she was not asked to exaggerate or lie at any time during the proceedings. (*See* Pet., Exs. B & C, ECF No. 1-2 at 103, 107.) Furthermore, any inconsistencies in Mendez's testimony were apparent on the stand, and where the defense had an opportunity to cross-examine her on those inconsistencies. *Cf. Morris v. Ylst*, 447 F.3d 735 744 (9th Cir. 2006) (finding no prosecutorial duty under *Napue* to investigate alleged witness perjury to extent witness just changed her story on the stand since defense knew of it and her inconsistent stories were grounds for cross-examination); *see also Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991) (*"*Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony.")

It was for the jury to decide whether Mendez was a credible witnesses and how much of her testimony was to be believed. *See, e.g., Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (noting that it is province of jury to determine credibility of

witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts); *Bruce*, 376 F.3d at 957 (stating that a jury's credibility determinations are entitled to near-total deference); *see also Carothers v. Rhey*, 594 F.2d 225, 229 (9th Cir. 1975). Petitioner's allegations regarding these allegedly "false" statements simply do not demonstrate a *Napue* violation because Kenniston has not shown that the evidence in question was false or that the prosecutor knew or reasonably should have known it was false. *See Mancuso*, 292 F.3d at 957 (rejecting *Napue* claim where there was no evidence prosecutor presented false testimony); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001) (rejecting claim that prosecution suppressed evidence that witness' testimony was false because petitioner presented no evidence that prosecution knew it was false). Therefore, Petitioner has failed to establish a due process violation based on presentation of false evidence.

In sum, the state court's denial of ground one was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. Accordingly, the Court **RECOMMENDS** the claim be **DENIED**.

### 2.    *Evidence of Investigation by Chula Vista Police (Claim Seven)*

In ground seven, Petitioner argues his due process rights under *Brady* were violated when the prosecution failed to turn over exculpatory documents referenced in a restraining order application filed by prosecution witness Jessica Green. (Pet., ECF No. 1-2 at 33-37.) As noted above, the state appellate court rejected Kenniston's *Brady* claim because Petitioner did not know what information the prosecution allegedly failed to disclose and thus his claim was "entirely speculative." (*See* Notice, ECF No. 19, Ex. C at 65.)

On March 24, 2011, two days after Kenniston broke into her home, Jessica Green applied for a temporary restraining order against him. (*See* Pet., Ex. U, ECF No. 1-4 at 12-15.) In her affidavit in support of the restraining order, Green stated that she had been "notified that [Kenniston] has been under surveillance for a year" for police impersonation. (*Id.* at 14.) In his Petition, Kenniston argues Green's statement in her

affidavit provides proof that there were police reports pertaining to an investigation by the Chula Vista Police Department that the prosecution failed to turn over to the defense. (*Id.*, ECF No. 1-2 at 36-37.)

Beyond the brief mention of the investigation in Green's affidavit, Petitioner offers no proof that such reports exist. Indeed, Detective Deaner testified that the investigation into Kenniston's impersonation as an officer began in February 2011, only a month prior to the filing of Greens' restraining order application.[8] (*See* Lodgment No. 2, vol. 26 at 3052, 3064.) Even assuming there are reports related to a year-long investigation of Petitioner conducted by Chula Vista Police, he fails to establish any such reports contained exculpatory or impeachment evidence. Moreover, Kenniston fails to show that any such evidence which would have been material to the defense. He merely speculates that a report may "arguably" contain information regarding surveillance which would have "cleared [him] of wrongdoing" on counts 15, 20 and 22, for which he was convicted of impersonating an officer and detaining another under California Penal Code section 146a(b)(1)(2). (*Id.* at 37-38.) As discussed above, mere supposition is insufficient to show that such reports contained information or evidence material to Petitioner's defense. *See Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (finding no *Brady* violation where the petitioner failed to show that a report existed, or that if it did, it contained exculpatory evidence); *see also Downs*, 232 F.3d at 1037 (rejecting *Brady* claim as too speculative).

Therefore, the Court finds the state court's denial of Petitioner's that claim his due process rights were violated by a failure of the prosecutor to turn over police reports purportedly held by the Chula Vista Police Department, was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407-08. The Court **RECOMMENDS** ground seven be **DENIED**.

---

[8] And it is clear from the testimony of Detective Deaner on cross-examination that defense counsel had a copy of his February 2011 report. (*See* Lodgment No. 2, vol. 26 at 3064.)

## C.    Insufficient Evidence (Claims Two, Four, Five and Six)

In claims two, four, five and six, Kenniston argues his due process rights were violated when he was convicted on certain counts based on insufficient evidence. Specifically, he asserts there was insufficient evidence to support his convictions for (1) kidnapping (ground two) (Pet., ECF No. 1-1 at 21-59); (2) two counts of impersonation of a public officer and detaining another (ground four) (*id.* at 91-100; ECF No. 1-2 at 1-10); (3) five true findings regarding wearing or exhibiting a badge or insignia while impersonating a public officer and detaining another (ground five) (*id.*, ECF No. 1-2 at 10-29); and (4) one count of child abuse likely to cause great bodily harm or death and one count of child cruelty (ground six) (*id.* at 30-32).

### 1.    State Court Decision and Standard of Review

This Court looks through to the last reasoned decision to address these claims – that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06. In denying Petitioner's habeas corpus petition, the appellate court denied all four insufficiency of evidence claims on procedural grounds, stating:

> Kenniston also challenges the sufficiency of the evidence supporting his convictions. "[C]laims of the insufficiency of evidence to support a conviction are not cognizable in a habeas corpus proceeding." (*In re Reno* (2012) 55 Cal. 4th 428, 505.) . . . Although Kenniston asserts that exceptions to these procedural bars should apply to his petition, he does not establish a valid basis for such an exception.

(Notice, ECF No. 19, Ex. C at 64-65.)

Respondent argues the claims are procedurally defaulted and thus barred from federal habeas review. (Resp't Answer, ECF No. 10-1 at 11.) However, because the Court finds that it is easier to dispose of the claims on the merits, the Court will not address the procedural bar invoked by Respondent.[9] *See Lambrix v. Singletary*, 520 U.S.

---

[9] The Court notes that Respondent has not alleged the state law barring insufficiency of evidence claims from being asserted on habeas corpus is independent and adequate. *See Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003) (holding that the initial burden to be met in

518, 524-25 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir.2002) (noting that federal courts "are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); *see also Smith v. Stewart*, 407 Fed. Appx. 237, 237-38 (9th Cir. 2011) ("We need not address the state's procedural default and exhaustion arguments because [the] petition is clearly without merit.")  Because the Court of Appeal rejected Kenniston's sufficiency of evidence claims on procedural grounds, this court will review them de novo.  *See Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Reynoso v. Guirbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## 2. *Clearly Established Law*

The Supreme Court has held that the due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005); *see also Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (per curiam ).  The Court must engage in a thorough review of the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443 U.S. at 319).

Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters*, 45 F.3d at 1358 (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) amended on denial of reh'g, 798 F.2d 1250 (9th Cir. 1986)).  A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds. *Juan H.*, 408 F.3d at 1275.  A petitioner's insufficient evidence claim

---

determining the adequacy of a state procedural bar is Respondent's and as such the state must "adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense").

15cv2724 AJB (BGS)

must be examined "with reference to the elements of the criminal offense as set forth by state law." *Id.*

### 3.    Conviction on Count One – Kidnapping (Claim Two)

In ground two, Kenniston argues there was insufficient evidence to support his conviction for kidnapping Mendez. (Pet., ECF No. 1-1 at 21.)  Under California law, to establish the crime of kidnapping, the prosecution must prove, "(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." *People v. Jones*, 133 Cal. Rptr. 2d 358, 362 (Cal. App. 2003) (citing Cal. Penal Code § 207(a)).[10]

As to the first element, physical compulsion is not required.  *People v. Majors*, 33 Cal. 4th 321, 326 (Cal. 2004).  When the victim "reasonably feels compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant, the asportation is forcible." *People v. Alvarez*, 201 Cal. Rptr. 3d 468 (Cal. App. 2016) (citing *Majors*, 33 Cal. 4th at 327).

Here, viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence to establish that Kenniston used force or fear to get Mendez to leave the apartment and get into his car without her consent.  Mendez testified that Kenniston had choked her (Lodgment No. 2, vol. 18 at 1852, 1858), yanked her off the bed by her ankles (*id.* at 1860-61), and threatened her with a knife, ultimately stabbing a pillow inches away from her face (*id.* at 1864-67).  She managed to free herself and went to a neighbors' apartment.  (*Id.* at 1851, 1867.)  She asked her neighbor to call the police. (*Id.* at 1870.)  When she looked outside, she saw Kenniston letting air out of her car's tires. (*Id.* at 1870, 1874.)  She ran back to her apartment and before she could close and lock

---

[10] Section 207(a) states: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." Cal. Penal Code § 207(a).

the door, Kenniston pushed his way back in.  (*Id.* at 1874-76.)  Mendez told Petitioner the police were on the way.  (*Id.* at 1875.)  He grabbed her with both hands, led her to his car and put her in the passenger seat.  (*Id.* at 1876-77, 1880, 1883.)  Mendez testified that she did not want to go with him and she did not want to get into his car.  (*Id.* at 1879.)  She wanted to wait for the police.  (*Id.*)  She stated that she was afraid of Kenniston.  (*Id.* at 1886.)  Once in the car, she told him if he let her go she would not press charges.  (*Id.* at 1887.)  Eventually, Kenniston calmed down somewhat and took her to a parking lot where Mendez's sister picked her up.  (*Id.*)

Mendez's testimony regarding Kenniston's physical assaults leading up to forcing her into his car against her will are sufficient to establish that he used both physical force and fear to get Mendez into his car.  Furthermore, she testified that she did not want to leave the apartment with him and did not want to get into his car.  As such, there was sufficient evidence that he took her away from the apartment without her consent. *Majors*, 33 Cal. 4th at 327.  In sum, when viewed in the light most favorable to the prosecution, there is more than enough evidence to support Kenniston's kidnapping conviction.

In his Petition, Kenniston goes to great lengths to point to inconsistencies in Mendez's testimony, her difficulty remembering certain specifics, and the fact that she admitted to being very anxious when testifying.  (*See* Pet., ECF No. 1-1 at 2-58.)  He argues there was no evidence presented that law enforcement was dispatched to the apartment following a 911 call.  (*Id.* at 51.)  He also notes that Mendez returned to testify a second time, during which she stated she remembered that she had been drinking on the day of the incident.  He contends this testimony makes it "clear that there was not a kidnapping but rather Mendez was intoxicated."  (*Id.* at 52.)

All of this evidence was before the jury.  Mendez admitted she was extremely anxious testifying and it was clear she had difficulty, at times, recalling specific details of certain events.  It was for the jury to evaluate and determine whether Mendez's testimony was credible. *See Walters*, 45 F.3d at 1358 (stating that a reviewing court "must respect

the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."); *see also Wright v. West*, 505 U.S. 277, 296 (1992).  On habeas review this Court must assume the jury resolved credibility disputes in favor of the prosecution.  *Jackson*, 443 U.S. at 326.

After independently reviewing the state court record and considering the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found that the essential elements of kidnapping (count one) were proven beyond a reasonable doubt.  *See id.* at 319.  The Court therefore **RECOMMENDS** ground two of the Petition be **DENIED**.

### 4.    *Convictions on Counts 15 and 20 (Claim Four)*

In ground four, Petitioner claims there was insufficient evidence to support his convictions for impersonation of a public officer and detaining another (Cal. Penal Code §146a) as to counts 15 and 20.  (Pet., ECF No. 1-1 at 91-100; ECF No. 1-2 at 1-9.)

At trial, the jury was instructed that in order to convict Kenniston on counts 15 and 20 (among others) the prosecution must prove that:

> 1.    The defendant falsely represented himself to be a public officer with the specific intent of inducing another person to believe that he was a public officer; and
>
> 2.    When the defendant falsely represented himself to be a public officer, he did any of the following:
>
>> (1)  Arrested, detained or threatened to arrest or detain any person, or
>>
>> (2) Otherwise intimidated any person.

(*See* Lodgment No. 1, vol. 4 at 843.)  The court further instructed the jury:  "A person is detained if under the same or similar circumstances a reasonable person would feel he or she was not free to leave.  A person can detain someone without using force."  (*Id.*)

/ / /

Jessica Green's daughter, Kylie, was 11 years old when her mother started dating Kenniston. (Lodgment No. 2, vol. 22 at 1585.)  Kylie testified that Kenniston told her and her mom that he was a funeral escort. (*Id.* at 2588.)  Petitioner also told Kylie he was allowed to pull people over, and it was kind of the same thing as highway patrol. (*Id.* at 2591.)  His car looked like a police car. (*Id.* at 2589.)  Kylie testified that Kenniston had a police scanner in his car and he told her he could talk to other policemen through the radio.  He said his nickname was "the sergeant." (*Id.*, vol. 23 at 2621, 2623.)  Kylie asked Petitioner if it was illegal to be listening to a police scanner and he replied, "Not if you're a cop." (*Id.* at 2624.)  He told Kylie he was "like a cop." (*Id.*)

Kylie testified about several occasions when she was a passenger in Petitioner's funeral escort car and he pulled people over. (*See id.* at 2595, 5897-98, 2604-06, 2614-15, 2616-20.)  With regard to count 15, Kylie testified that she was riding in the funeral escort car with Petitioner.  They were driving near a shopping center when a blue car either ran a stoplight or was going too fast.  Kenniston turned on his car's flashing lights and pulled the driver over.  Kylie testified that Petitioner got out of his car and went to talk to the driver. (*Id.* at 2602.)  When Kenniston came back, Kylie asked him why he had not ticketed the driver.   Petitioner replied he decided not to give a ticket because the driver realized what he did was wrong and had apologized. (*Id.* at 2597-98, 2601.)

As to count 20, Kylie testified that Kenniston had been driving her to school.  They were on the 805 freeway when she saw a yellow sports car.  Petitioner said the car was "going 90 on the freeway." (*Id.* at 2604.)  Kenniston turned on his car's overhead flashing lights and pulled over the yellow car. (*Id.* at 2605.)  He told Kylie to stay in the car and he would be back soon.  Kenniston approached the yellow car and returned after about five minutes. (*Id.* at 2606.)  When Kenniston returned to his car, Kylie asked him why he did not give the driver a ticket.  He told her he had left his ticket book at home and he didn't want her to be late for school while waiting for a police officer to bring him a ticket book. (*Id.* at 2606-07.)  Kenniston told Kylie the driver of the yellow car was a man in his 50s. (*Id.* at 2607.)

In addition to Kylie's testimony regarding these two specific instances, evidence was presented showing that Kenniston had told others he had the power to pull people over (*id.*, vol. 15 at 1397, vol. 20 at 2236-37) and other witnesses testified that his car looked like a law enforcement vehicle, complete with overhead light bar, sirens and dash lights.  (*See id.*, vol. 15 at 1401, 1559, 1562; vol. 16 at 1442-43, 1452-53, 1465; vol. 26 at 3060-63.)  Additional witnesses testified about other instances, similar to those described by Kylie, when Kenniston had pulled vehicles over.  (*Id.*, vol. 16 at 1560, 1620-21, 1638; vol. 17 at 1702; vol. 22 at 2237-38.)

Viewing all the evidence in the light most favorable to the verdict, there was more than sufficient evidence to support Kenniston's convictions on counts 15 and 20.  Kylie's testimony established that in both cases, Kenniston used his car's overhead flashing lights to get drivers to pull over.  His car looked similar to a law enforcement vehicle.  A reasonable juror could infer from this that Kenniston intended to induce both drivers to believe he was a law enforcement officer, in order to pull them over and detain them.  Thus, there was sufficient evidence to support counts 15 and 20.

Kenniston appears to argue that Kylie's testimony was insufficient to establish that the drivers "believed" he was a law enforcement officer.  (Pet., ECF No. 1-2 at 7-8.)  As noted above, the mere fact the drivers pulled over after Petitioner followed them with his vehicle's overhead lights flashing, is sufficient for the jury to infer that they only stopped because they believed he was a law enforcement officer.  Moreover, section 146a requires only that Petitioner acted with "specific intent of inducing" the drivers to believe he was an officer.  Cal. Penal Code § 146a.  Given the other evidence of Petitioner pulling over vehicles and allowing the passengers to believe he was a police officer, there is more than sufficient evidence to support his conviction.

Petitioner further argues that Kylie's testimony was improper under the Federal Rules of Evidence 701.  (Pet., ECF No. 1-1 at 97-100.)  First, the Federal Rules of Evidence are irrelevant to evidence presented at his trial in California state court.  Moreover, Rule 701 pertains to opinion testimony of layperson.  Specifically, it provides

that a nonexpert witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, [and] (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701. Even if the Federal Rules of Evidence were applicable, Kylie's testimony would not be excluded. She did not testify as to her opinion about what Kenniston's intent was or what the drivers believed. She merely testified as to what she observed. The jury was left to infer from those facts whether Petitioner had specific intent to make the drivers believe he was a law enforcement officer when he pulled them over. *See Walters*, 45 F.3d at 1358.

Kenniston also argues that the inferences drawn from Kylie's testimony were improper under California Evidence Code section 600, which states:

> a) A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence.

> (b) An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.

Cal. Evid. Code § 600. As discussed above, a reasonable juror could properly deduce from Kylie's testimony that Kenniston intended to impersonate an officer when he stopped the drivers.

Finally, Petitioner argues that because the drivers did not testify, there is no way to establish that they believed he was a law enforcement officer. (Pet., ECF No 1-2 at 7.) Again, Kenniston misunderstands the statute. It requires specific intent of "inducing another person to believe" the person was an officer – not that the person actually believe it. *See* Cal. Penal Code § 146a. Nonetheless, even if it were a requirement, the fact that the drivers both pulled over after Kenniston turned on his car's overhead flashing lights is sufficient for a jury to infer the drivers did think he was an officer, with the power to detain them.

In conclusion, and for the foregoing reasons, viewing the entire record as a whole in the light most favorable to the verdict, a reasonable juror could find that Kenniston was guilty of impersonating an officer as to counts 15 and 20, beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  The Court therefore **RECOMMENDS** ground four be **DENIED**.

### 5. *California Penal Code §§ 5538d & 667.17 Allegations (Claim Five)*

Petitioner argues there was insufficient evidence to support a true finding that he impersonated an officer during the commission of a felony, as to counts 8, 10, 15, 20 and 22, pursuant to California Penal Code sections 538d, 667.17.  (Pet., ECF No. 1-2 at 10-29.)

California Penal Code section 667.17 provides that "Any person who violates the provisions of Section 538d [impersonating a police officer] during the commission of a felony shall receive an additional one-year term of imprisonment to be imposed consecutive to the term imposed for the felony, in lieu of the penalty that would have been imposed under Section 538d."[11]  In turn, section 538d, provides in pertinent part:

> [A]ny person who willfully wears, exhibits, or uses, or who willfully makes, sells, loans, gives, or transfers to another, any badge, insignia, emblem, device, or any label, certificate, card, or writing, which falsely purports to be authorized for the use of one who by law is given the authority of a peace officer, or which so resembles the authorized badge, insignia, emblem, device, label, certificate, card, or writing of a peace officer as would deceive an ordinary reasonable person into believing that it is authorized for the use of one who by law is given the authority of a peace officer.

Cal. Penal Code § 538d(c).

/ / /

/ / /

---

[11] Convictions under California Penal Code section 538d are typically misdemeanors.  *See* Cal. Penal Code § 538d(a).

There is sufficient evidence to support the true findings on the section 538d allegations as to all claims. First, with regard to count eight, Lizbeth Figueroa testified that on March 11, 2011, she dropped her children off at Chula Vista Elementary School. (Lodgment No. 2, vol. 16 at 1555-58.) She parked in the loading zone while she talked on the phone. She then saw what she believed was a police car pull up behind her with its lights on. She heard someone say over a speaker, "Please move your vehicle. This is not a parking zone." The car pulled next to Figueroa and the man, later identified as Kenniston, told Figueroa she needed to move her car or he would tow it. (*Id.* at 1558-59.) Figueroa noticed the words "Funeral Escort" on the side of the door. (*Id.* at 1562-64.) Kenniston told Figueroa that her tags were expired and asked to see her license and registration. He then got on his radio and said it was going to be an "1185," which Figueroa understood from her job as a security agent at a hospital to mean he was going to tow her. (*Id.* at 1564-66.) They both got out of their cars and she handed Petitioner, who was wearing a badge, her license and registration. (*Id.* at 1567.) She told Kenniston she had not had time to get to the DMV. After Figueroa told Petitioner she worked in security, his demeanor changed. Petitioner then introduced himself as "Kevin" and told her he had a friend at the DMV if she needed to go without waiting in line. (*Id.* at 1568.)

As for count ten, 16 year-old Ivan Fernandez testified that in June or July 2010, he picked up his friend Nichole Ballesteros. (*Id.* at 1603-06.) When Fernandez made a turn, he cut off a motorcycle with a "police officer" on it and almost got in an accident. Fernandez kept driving. The "officer" on the motorcycle made a U-turn, turned on his siren and pulled Fernandez over. (*Id.* at 1608-10, 1620.) The "officer," later identified as Kenniston, asked Fernandez to get out of his car and sit on the curb. Fernandez testified that Petitioner was wearing a uniform, helmet, badge and the type of belt worn by police officers. (*Id.* at 1629.) Fernandez believed he was a police officer. (*Id.*) Petitioner gave Fernandez the option of having his car towed or apologizing to Ballestros' mother. (*Id.* at 1626.) Fernandez went to Ballesteros' house and knocked on the door. Kenniston

/ / /

followed.  Ballesteros' mother testified that Petitioner was "dressed as a cop" identified himself as "Officer Kenniston."  (*Id.*, vol. 17 at 1670.)

The evidence in support of counts 15 and 20 is discussed above in section V(C)(4) of this Report and Recommendation.  In short, Kylie testified that Kenniston stopped two cars, using the flashing lights of his funeral escort car.  (*Id.*, vol. 22 at 2597-02, 2604-07.)

Finally, with regard to count 22, Kylie testified that Kenniston was driving her in his funeral escort vehicle to pick up a friend for a sleepover.  (*Id.* at 2614.)  They saw a homeless man near a freeway exit ramp.  (*Id.*)  Kennston said to Kylie, "Watch this," and then got on his loud speaker and told the homeless man, "get off my freeway."  Kylie testified the man seemed scared and quickly gathered up his belongings.  Petitioner then told the man he would buy him a pizza if he picked up trash on the freeway.  (*Id.* at 2614-15.)

In addition to the testimony of Figueroa, Fernandez, Ballesteros and Kylie, additional evidence was presented that showed Petitioner's funeral escort vehicle looked like a police car, with flashing red, amber and white lights on the top, as well as flashing blue lights in the grill and in the dash area.   (*Id.*, vol. 16 at 1530-31, 1537; vol. 20 at 2203-05; vol. 26 at 3061-63.)  Based on all the evidence presented and viewing it in the light most favorable to the verdict, there is sufficient evidence that Kenniston's vehicle, uniform and badge "so resembled an authorized" badge, uniform and/or vehicle as to make a reasonable person believe they were authorized for use by a law enforcement officer.  *See* Cal. Penal Code § 538d; *Cf. e.g., People v. Diaz*, 2005 WL 941402 (Cal. App. 2005) (unpublished) (stating that an ordinary reasonable person could be deceived by similarities in a badge, including the shape, the color, symbol, without making a detailed comparison of smaller, less visible words and symbols).

Kenniston further argues in claim five that the prosecutor engaged in selective and vindictive prosecution, in violation of his due process rights.  (*See* Pet., ECF No. 1-2 at

/ / /

/ / /

13-25.)   The decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion.  *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also United States v. LaBonte*, 520 U.S. 751, 762, (1997) (holding courts generally have no place interfering with a prosecutor's discretion regarding whom to prosecute, what charges to file, and whether to engage in plea negotiations); *United States v. Duran*, 41 F.3d 540, 544 (9th Cir. 1994) ("If the prosecutor has probable cause to believe a defendant committed a crime, the decision of whether to prosecute and the charges to be filed rests with the prosecutor.")  Yet, while a prosecutor's discretion is broad, it is not without limits.  The decision to prosecute may not be based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.  *Armstrong*, 517 U.S. at 464.

The Ninth Circuit has noted there is "little substantive difference" between selective prosecution and vindictive prosecution.  *United States v. Wilson*, 639 F.2d 500, 502 (9th Cir. 1981).  Vindictive prosecution arises when the government increases the severity of alleged charges in an attempt to punish a defendant for exercising a protected statutory or constitutional right.  *United States v. Goodwin*, 457 U.S. 368 (1982).  To establish actual prosecutorial vindictiveness, a defendant must show, through objective evidence, that the prosecutor acted with genuine animus toward the defendant for exercising a specific right, and that the defendant would not have been prosecuted "but for" that animus.  *Id.* at 380 n. 12; *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982).

Selective prosecution arises when a "petitioner alleges he is being initially prosecuted for having exercised a constitutional right."  *Wilson*, 639 F.2d at 502.  To establish selective prosecution, a petitioner must show "(1) that similarly situated persons have not been prosecuted and (2) that he was selected for prosecution on the basis of an impermissible ground such as race, religion or the exercise of constitutional rights."  *United States v. DeTar*, 832 F.2d 1110, 1112 (9th Cir. 1987).

/ / /

15cv2724 AJB (BGS)

Here, Kenniston claims that the prosecutor's decision to charge him with the California Penal Code section 538d counts was motivated by a desire to punish him for exercising is First Amendment right to advertise his funeral escort business.  (*See* Pet., ECF No. 1-2 at 16-17.)   This argument is entirely speculative.  Kenniston offers no evidence that the prosecutor sought to punish Petitioner for advertising his business.  As such, the claim is without merit.  *See James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (stating that conclusory allegations do not warrant habeas relief).

Kenniston further argues that the prosecutor was improperly motivated to charge him under section 538d because of an uncharged allegation he may have pulled over the wife of a deputy district attorney.  (*Id.* at 22-25.)   Enrique Camarena briefly handled Petitioner's case in the very early stages.  (*See* Lodgment No. 2, vol. 1 at 15-16.)  After learning that his wife may have been pulled over by Petitioner in 2010, Camarena notified his supervisors and the case was assigned to another prosecutor, William La Fond, who was from another division of the District Attorney's Office.  (*See* Lodgment No. 1, vol. 1 at 11-14.)  An "ethical wall" was established to avoid any conflicts.  (*See id.*)  No charges related to the stop of Camarena's wife were ever brought.[12]  The trial court found there was no basis for recusing the District Attorney's Office from prosecuting the case.  (Lodgment No. 1, vol. 1 at 14-15.)   And that there was no evidence of "any desire to treat Mr. Kenniston differently or unfairly."  (*Id.* at 16-17.)

Petitioner again fails to show that the prosecutor acted with animus toward him.  As discussed above, there was substantial evidence that Petitioner had impersonated a police officer on numerous occasions, using his funeral escort vehicle which looked strikingly similar to a police car, to induce people to pull over.  Given the strength of the evidence against Petitioner in contrast to Camarena's very brief involvement in the case, Petitioner has not established the any "genuine animus" on the part of Deputy District

_____

[12] Mrs. Camarena never positively identified Kenniston as the person who pulled her over.  (*See* Lodgment No. 2, vol. 1 at 15.)

Attorney La Fond.  Furthermore, even assuming arguendo there was some animus, Kenniston fails to establish it had anything to do with his exercise of his First Amendment rights.  Thus, Petitioner's vindictive prosecution claim is meritless.

Petitioner's selective prosecution claim is similarly without merit.  Petitioner argues other funeral escort services used similar logos, badges and patches and had not been similarly prosecuted.  Yet he does not establish that the prosecutor in his case was motivated by a discriminatory purpose.  *See United States v. Christopher*, 700 F.2d 1253, 1258 (9th Cir. 1983) ("Mere selectivity in prosecution . . . creates no constitutional problem. The impermissible selection must be shown to be based on an unjustifiable standard[.]")  Petitioner has made no showing that the government focused its investigation on him because of any purported First Amendment activities.

In light of the evidence against him, neither the initial prosecution of Petitioner nor the severity of the charges suggest any improper motivation on the prosecution's behalf, and therefore his claims of vindictive and selective prosecution claims are without merit. Moreover, viewing the entire record as a whole in the light most favorable to the verdict, a reasonable juror could find that Kenniston was guilty of California Penal Code section 538d as to counts 8, 10, 15, 20 and 22, beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.  The Court **RECOMMENDS** claim five be **DENIED**.

### 6.    *Convictions on Counts 18 and 19 (Claim Six)*

In ground six, Kenniston argues there was insufficient evidence to convict him of child abuse (count 18) (Cal. Penal Code § 273a(a)) and cruelty to a child by endangering health (count 19) (Cal. Penal Code § 273a(b)).  (Pet., ECF No. 1-2 at 30-32.)

Under California Penal Code section 273a(a), the prosecution must prove:

(1)  The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered; and

/ / /

      (2)  The defendant caused or permitted the child to be endangered under the circumstances or conditions likely to produce great bodily harm or death; and

      (3)  The defendant was criminally negligent when he caused or permitted the child to be endangered.

(*See* CALCRIM No. 821; Lodgment No. 1, vol. 4 at 846; *see also* Cal. Penal Code § 273a(a).)

California Penal Code section 273a(b) requires proof that:

      (1)  The defendant willfully caused or permitted a child to suffer unjustifiable mental suffering; or

      (2)  The defendant, while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered.

(CALCRIM No. 823; Lodgment No. 1, vol. 4 at 845; *see also* Cal. Penal Code § 273a(b).)  As the trial court instructed the jury, misdemeanor child abuse (§ 273a(b)), is a lesser-included offense of felony child abuse (§ 273a(a)).  (Lodgment No. 1, vol. 4 at 860-61; *see also People v. Lofink*, 206 Cal. App. 3d 161, 168-69 (Cal. App. 1988).)

Kylie provided the bulk of the evidence against Petitioner as to counts 17 through 19.  She testified that she was riding in the funeral escort car with Kenniston.  They were getting off an "off-ramp" near a 7-Eleven and the Telegraph Canyon Shopping Center and there was a man out of his car window, looking around in the bushes on the side of the road.  (Lodgment No. 2, vol. 2 at 1618.)  Kenniston turned on his car's siren and lights.  There was not enough room to pull off the road so Petitioner stopped in the left exit ramp lane, blocking one lane of traffic.  Petitioner, still in his car, asked the man what he was doing and the man responded that he was a college student and he was looking for his college parking pass, which had blown out his car window.  (*Id.* at 2618-19.)  Kenniston got out of his car and helped the man look for the parking pass. After about three minutes, Petitioner said the parking pass was not there and told the student to

get off the road.  (*Id.* at 2619.)  The student thanked Kenniston, got in his car, and left.  (*Id.* at 2620.)

The jury acquitted Kenniston of count 17 -- impersonating a public officer and detaining another, in violation of California Penal Code section 146a.  Petitioner argues that because the jury found him not guilty on that count, he must necessarily be not guilty of the coinciding child abuse and child endangerment counts (counts 18 and 19).   He claims the verdicts are inconsistent.  (*See* Pet., ECF No. 1-2 at 30-31.)

First, there is nothing inconsistent about the jury's verdicts.  It is possible to find that Kenniston was not guilty of count 17 because, according to Kylie's testimony, Petitioner did not pull over the driver but rather came upon him, already stopped.  Thus, the jury may have found there was insufficient evidence to conclude Petitioner had "detained" the driver while impersonating an officer.  (*See* Cal. Penal Code § 146a.)  This conclusion is not inconsistent with the guilty verdicts on counts 18 and 19.  In order to find Petitioner guilty on both counts, the jury need only find that Kenniston, by stopping on the freeway ramp and blocking traffic with Kylie in his car, he had wilfully endangered her with criminal negligence, in a manner that could result in great bodily harm or death.  (*See* Cal. Penal Code § 273a(a).)[13]  Therefore, given Kylie's testimony, when viewed in the light most favorable to the prosecution, there was sufficient evidence to support the jury's verdicts on counts 18 and 19.  *See Jackson*, 443 U.S. at 319.

Furthermore, the Court notes that even if the jury's verdicts were inconsistent, Kenniston would not be entitled to relief.   Sufficiency of the evidence on one count is "independent of the jury's determination that evidence on another count was insufficient."  *United States v. Powell*, 469 U.S. 57, 67 (1984).  The Supreme Court has "has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal."  *Ferrizz v. Giurbino*, 432 F.3d 990, 992-93 (9th

---

[13] Although the jury found Petitioner guilty on both counts 18 and 19, the trial court struck count 19, the lesser-included offense, at sentencing.  (*See* Lodgment No. 1, vol. 5 at 1152.)

Cir. 2005) (citing *Powell*, 469 U.S. at 65).  As the Ninth Circuit has stated, "[t]he underlying rationale of these cases is that the acquittal on one count may be explained as an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence."  *Ferrizz*, 432 F.3d at 993.

    Thus, based on the foregoing, viewing the evidence in the light most favorable to the verdict, the Court finds Petitioner has failed to show there was insufficient evidence to support the jury's findings as to counts 18 and 19.  *See Jackson*, 443 U.S. at 319. Therefore, the Court **RECOMMENDS** claim six be **DENIED**.

### D.    Testimony of Expert Witness Mitch Kojima (Ground Three)

    In ground three, Kenniston argues that his due process rights were violated when the trial court permitted the testimony of an expert witness.  (Pet., ECF No. 1-1 at 85-89.) He also contends the prosecution failed to comply with discovery rules, in violation of his due process rights.  (Pet., ECF No. 1-1 at 77-80.)

    The last reasoned state court decision to address this issue is that of the California Court of Appeal.  In denying Petitioner's habeas petition, the court concluded that this claim was procedurally barred because "habeas corpus is not an available remedy to review the rulings of the trial court with respect to the admission or exclusion of evidence.  (*In re Lindley* (1947) 29 Cal. 2d 709, 723.)"  (Notice, ECF No. 19, Ex. C at 65.)

    Respondent argues the claim is procedurally defaulted under *In re Dixon*, 41 Cal. 2d 756, 759 (1953) because it could have been, but was not, raised on direct appeal. (Resp't Answer, ECF No. 10-1 at 10.)  However, because the Court finds that it is easier to dispose of the claims on the merits, the Court will not address the procedural bar invoked by Respondent.[14]  *See Lambrix*, 520 U.S. at 524-25; *Franklin*, 290 F.3d at

---

[14] The Court notes that Respondent did not assert that the procedural bar ultimately imposed by the state court is independent and adequate.  *See Bennett*, 322 F.3d  at 586 (holding that the initial burden to be met in determining the adequacy of a state procedural bar is Respondent's

1232 (noting that federal courts "are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); *see also Smith*, 407 Fed. Appx. at 237-38 (9th Cir. 2011). Because the court of appeal rejected Kenniston's claim regarding expert testimony on procedural grounds, this court will review the claim de novo. *See Stanley*, 633 F.3d at 860; *Reynoso*, 462 F.3d at 1109.

Kenniston argues that the trial court improperly allowed the expert testimony of Mitch Kojima, an investigator for the California Department of Consumer Affairs, Bureau Security Investigate Services (BSIS). (*See* Pet., ECF No. 1-1 at 59-90.) The BSIS regulates private security companies, locksmiths, private investigators and security alarm companies. (Lodgment No. 2, vol. 20 at 2191-92.) Kojima testified about how private security officers dress, including badges and patches, must differ from the dress of a law enforcement officer. (*Id.* at 2193-95.) Kojima also testified regarding the manner in which private security vehicles must differ in appearance from official police cars. For instance, Kojima testified that only amber lights are permitted on security vehicles and, if Kenniston's escort car were submitted to him as a private security vehicle, Kojima would conclude it to be in violation of the law because its red lights and markings did not clearly indicate it was not a law enforcement vehicle. Kojima testified that it was his opinion that a vehicle such as Kenniston's could be confused with a police car. (*Id.* at 2203-04.) He further testified that Petitioner's badge, patches and uniform would be in violation of state laws if it were used by a private security person because of their similarity to Highway Patrol uniforms. (*Id.* at 2205, 2209.) Kojima admitted, however, that California law permitted vehicles to have the markings on Petitioner's car if it is being utilized in a funeral procession. Kojima further admitted that the BSIS does not regulate funeral escort vehicles. (*Id.* at 2212-13.)

---

and as such the state must "adequately ple[a]d the existence of an independent and adequate state procedural ground as an affirmative defense").

Petitioner alleges that Kojima's testimony should not have been admitted because his duties at the BSIS did not include regulation of funeral escorts. Therefore, Kenniston argues, Kojima's opinion regarding Petitioner's vehicles and uniform was irrelevant and unduly prejudicial. (*See* Pet., ECF No. 101 at 84-86.) Furthermore, Petitioner argues Kojima's testimony was contrary to California Evidence Code sections 720 and 801.[15]

First, to the extent Kenniston asserts the trial court's admission of the challenged testimony was in violation of California rules of evidence, his claim is not cognizable on

_____

[15] California Evidence Code section 720 states:

(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.

(b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony.

Cal. Evid. Code § 720.

California Evidence Code section 801 states:

If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.

Cal. Evid. Code § 801.

habeas review and must be denied.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (finding issues regarding state law are not cognizable on federal habeas corpus review and it is not the province of the federal habeas court to re-examine state-court determinations on state-law questions); *Dubria v. Smith*, 224 F.3d 995, 1001 (9th Cir. 2000).

"Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process." *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009) (citing *Estelle*, 502 U.S. at 67-68).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters*, 45 F.3d at 1357.  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *Jammal*, 926 F.2d at 920.  Here, there were permissible inferences a jury could draw from Kojima's testimony.   For instance, the jury could properly infer that Kenniston's uniform, badge and vehicle were of the type that could be confused with those used by law enforcement personnel.

Furthermore, to the extent Petitioner argues the admission of Kojima's testimony was irrelevant and prejudicial, he is not entitled to habeas relief.  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent under § 2254(d)); *see also Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015) (concluding that because there is no United States Supreme Court case establishing the fundamental unfairness of admitting multiple

hearsay testimony, *Holley* bars any such claim on federal habeas review).  Absent such "clearly established Federal law," the Court cannot conclude that the state court's ruling was an "unreasonable application" thereof.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court. . .it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'")

Even assuming Kojima's expert testimony was improperly admitted in violation of due process, Petitioner is not entitled to relief because the error did not have "'a substantial and injurious effect' on the verdict." *Dillard v. Roe*, 244 F.3d 758, 767 n. 7 (9th Cir. 2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Here, the trial court specifically instructed the jury on how to evaluate the expert opinion testimony by providing CALCRIM No. 332, which states:

> Witnesses were allowed to testify as an expert and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

> An expert witness may be asked a hypothetical question.  A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.  It is up to you to decide

> whether an assumed fact has been proved.  If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.

(Lodgment No. 2, vol. 4 at 822.)  As such, the jury was free to consider the fact that Kojima's job at the BSIS did not specifically include regulation of funeral escort vehicles or uniforms.  Furthermore, the jury had plenty of opportunity to evaluate whether the

Kenniston's escort vehicle, his uniform and badge were such that a reasonable person might believe they were that of a law enforcement officer, even without Kojima's opinion on the matter. Several witnesses, including Figueroa, Fernandez, Nichole Ballesteros and Amparo Ballesteros, testified that they mistook Kenniston's vehicle for a police car (*see* Lodgment No. 2, vol. 16 at 1558-59) and that Kenniston's uniform looked like that of a police officer. (*Id.* at 1530-31, 1537, 1629, 1638-39; vol. 17 at 1670; vol. 20 at 2203-05; vol. 26 a 3061-63.) The jury also saw several photographs of Kenniston's vehicle and uniform. (*See e.g., id.*, vol. 26 at 3056-63.) Based on the evidence presented, Petitioner cannot show that any purported error had a substantial injurious effect on the verdict. *See Brecht*, 507 U.S. at 638.

Finally, Petitioner argues the defense failed to provide notice of Kojima's testimony 30 days prior to trial, as required under California Penal Code section 1054.7. (Pet., ECF No. 1-1 at 86.) As discussed above, because federal habeas corpus relief may be granted only for a violation of the Constitution or laws of the United States, the claim is not cognizable. *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68, (holding that federal habeas corpus relief is not available to remedy alleged errors of state law); *see also Jammal*, 926 F.2d at 919 (federal courts sitting in habeas corpus do not review question of state evidence law).

In sum, Petitioner has not shown his due process rights were violated by the admission of expert testimony from Mitch Kojima. *Estelle*, 502 U.S. at 67-68. Even assuming such a violation, Kenniston would not be entitled to relief because he has not shown any error had a substantial injurious effect. *See Brecht*, 507 U.S. at 638. The Court therefore **RECOMMENDS** claim three be **DENIED.**

/ / /

/ / /

/ / /

/ / /

/ / /

### E.    Severance (Ground Eight)

In ground eight, Kenniston argues his due process rights were violated by the trial court's failure to sever the charges.  Specifically, he contends his due process rights were violated when the trial court denied his request that counts one and two (Mendez counts) be severed from counts 3-6, 23, 26-32 (Green counts), and that both these cases also be severed from counts 7-10 and 13-22 (impersonation and child endangerment counts). (*See* Pet., ECF No. 38-48.)

Kenniston raised this claim in his petition for review to the California Supreme Court and it was denied without comment.  (*See* Lodgment Nos. 6 & 7.)  Thus, this Court "looks through" to the last reasoned decision to address this claim, that of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805-06.  The appellate court denied the claim, stating:

A. Trial Court Ruling Denying Severance

In denying defendant's pretrial motion to sever, the trial court ruled in part as follows:

"Here what we have are what the defense term three separate cases.  Case number one concerns Counts 1 and 2 where the alleged victim is Esmeralda Mendez, events from 2007 allege kidnapping and false imprisonment as counsel has termed it domestic violence.

"Case two is Counts 3 through 6, 23, and 26 through 32 where the alleged victim is Jessica G. as well as Kylie G., the daughter of Jessica.  Alleged disobeying of restraining orders and cruelty of a child, events in 2011. Similarly, domestic violence related allegations.

"Count 3 -- or case three concerns Counts 7 through 10 and 13 through 22, alleged impersonating of an officer with multiple alleged victims, events from 2010 and 2011.

"Looking at the types of cases, as I have indicated, case number one as well as case number two appear to have the same class of crimes insofar as both are domestic violence

related offenses, alleged DV and alleged DV violation of restraining order.  Thus, the same class of crimes. [¶] . . . [¶]

"Cases one and two also appear to have cross admissible evidence under Evidence Code Section 1109, Subdivision (a)(1).  There is, contrary to the defense position, it would not be simply a two-witness case as against Esmeralda, he said/she said.  But because of 1109, there would be cross admissibility of evidence concerning Jessica G. and other alleged victims of domestic violence such that it would not be a two-witness case.

"So in terms of judicial economy, if there were a severance, it would be presenting all that 1109 evidence twice, once for case number one, once for case number two.  So judicial economy is not served in that way.

"Also, the Court understands that Evidence Code Section 352 is ultimately an additional consideration when evaluating 1109 evidence, and I will defer that until a further discussion momentarily.

"Looking at what we have here between cases one and two is four-year gap between 2007 and 2011.  That does not appear to be too great of a distance, given that both are of the same class of domestic violence conflict and both appear to be of the same amount of alleged violence, this does not appear to be a situation where . . . one case is grossly violent and the other comparatively benign.  The level of alleged violence in both appears to be on par.

"Now, balancing the prejudice versus the probative value under [Evidence Code section] 352, the Court has examined the prejudice versus the probative value and finds that it would be more probative than prejudicial.  And, again, I will go through some additional factors momentarily.

"Looking at cases two and three, while false impersonation is not the same class, they do appear to be connected in their commission insofar as Kylie G. was present, as I believe counsel indicated, in five out of the eight alleged instances of impersonating an officer, the same Kylie G. that is

connected with case two.  The percipient witness to quite a few of these events.

"So, it's the first prong of Penal Code Section 954 connected together in their commission that would attach counts two -- both cases two and case three.

"But looking at the [Evidence Code section] 352 considerations, some of the factors that the Court has examined include the fact that are [sic] some of the charges more likely to inflame the jury than the other[s].  Looking at them on the balance, the Court answers that no, it does not appear that some are more prejudicial or inflammatory, that -- that it would prejudice the alleged weaker case.

"Secondly, are the People attempting to join a weak case with a stronger case to bolster the weak case?  The defense has indicated that case number one is the stronger case.  Looking at this as a two-witness, he said/she said, but as the Court indicated, because of [Evidence Code section] 1109, it would not be a he said/she said two witness, there would be multiple people testifying as to 1109 evidence.  So it would be much more than that.  So it does not appear to be attaching a strong case to bolster a weak case.

"Third, is this a situation where one of the charges is a capital offense [?]  The answer to that is no.

"So balancing the prejudice and the probative value, it does not appear under [Evidence Code section] 352 that the Court should separate and sever cases one, two, or three from being tried together.

"And, finally, is this a situation where there would be a gross unfairness amounting to a denial of due process[?]

[Citation.]  It does not appear to be such a situation.  [¶] Therefore, based on all of these reasons, the motion will be denied."

B. Guiding Principles

Section 954 provides in part:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or . . . of the same class of crimes or offenses. . . . [P]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *see People v. Lucky* (1988) 45 Cal.3d 259, 276.)

The law prefers consolidation or joinder of charged offenses in the interests of judicial economy (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220), and the language of section 954 shows legislative intent for a "very broad test for joinder" (*id.* at p. 1217). Indeed, the joinder of related charges, "'"whether in a single accusatory pleading or by consolidation of several accusatory pleadings, ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials [citation], and in several respects separate trials would result in the same factual issues being presented in both trials.'"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 409; *see Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220 [noting that "because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law"].)

C. Analysis

1. Severance of Mendez Counts and Jessica G. Counts

Defendant admits both the Mendez counts and the Jessica G. counts involved domestic violence.  This concession alone shows their joinder was proper.  However, even without the concession, we have little difficulty

concluding the trial court properly exercised its discretion (*see People v. Marshall* (1997) 15 Cal.4th 1, 27-28) in refusing to sever the Mendez counts and the Jessica G. counts because the record contains ample evidence supporting the finding that both the Mendez counts and the Jessica G. counts were of the "same class of crimes or offenses" under section 954. That is, both the Mendez counts and the Jessica G. counts involved domestic violence, the subsequent violation of a domestic violence restraining order and false imprisonment of a domestic violence victim. Because both the Mendez counts and the Jessica G. counts possessed common characteristics and attributes, their joinder was proper. (*See Alcala v. Superior Court*, supra, 43 Cal.4th at p. 1220; *Aydelott v. Superior Court*, supra, 7 Cal.App.3d at p. 722.)

Once criminal charges are properly joined, as in the instant case, the "'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'" (*People v. Soper* (2009) 45 Cal.4th 759, 773.) To meet this burden, a defendant must show the ruling fell "'"'outside the bounds of reason.'"'" (*Id.* at p. 774.)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling'" and focus on "'certain criteria [that] have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.'" (*People v. Soper*, supra, 45 Cal.4th at p. 774.)

"First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*People v. Soper*, supra, 45 Cal.4th at pp. 774-775.)

Here, defendant wisely has conceded that the Mendez counts and the Jessica G. counts were cross-admissible pursuant to Evidence Code section 1109, subdivision (a)(1), which provides (with exceptions not relevant here): "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

He nonetheless contends he made a "clear showing of potential prejudice" (*People v. Sandoval* (1992) 4 Cal.4th 155, 172) to warrant severance because: (1) the counts and facts surrounding Mendez allegedly were far more serious than those surrounding Jessica G., thus causing the jury to become inflamed against defendant; and (2) the evidence related to both sets of counts allegedly was relatively weak, and, thus, the cases were brought together for their collective strength.

Regarding defendant's first contention, we disagree the Mendez counts were more serious, much less "far more serious" as he posits, than the Jessica G. counts such that joinder was likely to inflame the jury against him. The evidence in the record shows in both the Mendez counts and the Jessica G. counts defendant repeatedly physically abused the victims, including pushing them against the wall, choking them and striking them after he had become angry. The record also shows neither Mendez nor Jessica G. sustained serious injury from the abuse, a fact which further supports a finding there was no prejudice, much less a "clear showing of potential prejudice" (see *People v. Sandoval*, supra, 4 Cal.4th at p. 172) absent joinder.

We also reject defendant's contention he established the requisite prejudice because the evidence related to both the Mendez counts and the Jessica G. counts was relatively weak, and, thus, the cases were brought together for their collective strength. [footnote omitted] As already noted, both Mendez and Jessica G. were victims of domestic violence by defendant; both were set to testify and did testify about defendant's multiple acts of domestic violence against them that possessed common characteristics; and both escaped serious injury as a result of the acts of violence by defendant. As such, we reject this contention.

"In any event, as between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges. [Citation.] Furthermore, the benefits of joinder are not outweighed -- and severance is not required -- merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried. [Citation.]" (*People v. Soper*, supra, 45 Cal.4th at p. 781.)

Because defendant has been unable to establish the requisite "clear showing of potential prejudice" required to sever properly joined charges (*see People v. Sandoval*, supra, 4 Cal.4th at p. 172) and because the benefits of joinder clearly outweighed any alleged potential prejudice to him (see *People v. Soper*, supra, 45 Cal.4th at p. 783), we have little difficulty concluding on this record that the court properly exercised its discretion in denying defendant's motion to sever the Mendez counts and the Jessica G. counts.

2. Severance of Mendez/Jessica G. Counts and Impersonation/Child Endangerment Counts

Defendant also contends the court abused its discretion and thus erred when it refused to sever the Mendez counts and the Jessica G. counts (sometimes hereafter domestic violence counts), on the one hand, from the impersonation/child endangerment counts, on the other hand.

The record shows that throughout their approximate 10-month relationship, defendant repeatedly represented to Jessica G. and her daughter Kylie that he possessed the power and authority of a sworn police officer. It was this same power and authority defendant exercised when he repeatedly stopped and/or detained others as charged in the impersonation counts, including in count 8 when defendant, in front of Kylie, detained Figueroa at Kylie's school. Because of the overlap of witnesses in the Jessica G. counts and the impersonation/child endangerment counts and because in those counts defendant's abuse of authority was at issue, we conclude the court properly exercised its discretion when it found these counts were properly joined for purposes of section 954.

Having concluded joinder was proper, as noted ante, the burden shifted to defendant to "'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'" (See *People v. Sandoval*, supra, 4 Cal.4th at p. 172.) Defendant has not met this burden.

Here, the evidence regarding defendant's repeated representations to Jessica G. and Kylie that he had the same power and authority as a police officer, even when separately confronted by Jessica G. and Kylie on this very issue, was clearly admissible in the impersonation counts. Moreover, evidence that defendant was restraining and detaining others and holding himself out to be something that he was not (i.e., a police officer) was also admissible in connection with the Jessica G. counts, where defendant also

60

held himself out to Jessica G. to be something that he was not (i.e., a police officer and a mercenary on his way overseas to participate in a dangerous mission that could result in him being "KIA").

In addition, the record shows Jessica G.'s daughter Kylie was a passenger in defendant's car in several instances when defendant pulled over motorists or otherwise exercised his alleged authority as a sworn police officer. What's more, Kylie was involved in and/or witnessed various incidents relevant to the Jessica G. counts including, by way of example only, the incident involving Figueroa in count 8, and the incident when Kylie believed defendant came to their home while her mother was at work and, in violation of a restraining order, knocked on the back door and "jiggled" the front door.

Defendant nonetheless contends he made the requisite clear showing of potential prejudice to warrant severance of the domestic violence counts from the impersonation/child endangerment counts because "[w]ithout the evidence related to Ms. Mendez and Ms. [G.], [defendant] would appear as an overzealous citizen who broke the law." However, as a result of the evidence from the domestic violence counts, defendant contends he allegedly was viewed as someone "sinister, controlling and power hungry," which thus inflamed the jury against him.

However, even absent evidence from the domestic violence counts, there is ample evidence in the record to show defendant was -- using his own words -- "sinister, controlling and power hungry" in connection with the impersonation counts, thus defusing his contention the jury was inflamed against him as a result of joinder of the domestic violence counts.

By way of example only, defendant did not appear to be merely an "overzealous citizen who broke the law" in connection with count 22. In this incident, he told Kylie to "'watch this.'" He then slowed down his car while driving on a freeway and, over the loudspeaker, told a homeless man to "'get off of my freeway.'" Defendant scared the homeless man, which appears in part to have been his motivation, and then offered to buy the man a pizza if he picked up trash along the freeway. This incident and others

///

1
2
3

(i.e., count 8 involving Figueroa or count 10 involving Fernandez and Ballesteros) support a finding the jury was not unduly inflamed against defendant, as he contends, because the domestic violence counts were joined with the impersonation/child endangerment counts.

4
5

(Lodgment No. 5 at 17-26.)

6          The state court's decision was not contrary to, or unreasonable application of,

7    clearly-established federal law.  First, no clear Supreme Court precedent exists, to date,

8    that establishes a constitutional violation for a misjoinder of claims.  *See Runningeagle*,

9    686 F.3d at 776-77 (finding that existing Supreme Court cases did not establish clearly

10   established law when misjoinder rises to a level of a constitutional violation) (citation

11   omitted); *see also, e.g., Martinez v. Yates*, 585 F. App'x 460, 460 (9th Cir. 2014) ( "There

12   is no clearly established Supreme Court precedent dictating when a trial in state court

13   must be severed."); *Collins v. Uribe*, 564 F. App'x 343, 343 (9th Cir. 2014) ("The

14   Supreme Court has never held that a trial court's failure to provide separate trials on

15   different charges implicates a defendant's right to due process."); *Grajeda v. Scribner*,

16   541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or

17   federal trial court's denial of a motion to sever can, in itself, violation the Constitution.")

18   "Because [there is] no clear answer to the question presented, . . . 'it cannot be said that a

19   state court unreasonably applied clearly established Federal law.'" *Wright v. Van Patten*,

20   552 U.S. 120, 126 (2008) (quoting *Musladin*, 549 U.S. at 77).

21          In any event, even assuming there is clearly established federal law permitting him

22   to exert a due process right, the state court's denial of the claim was neither contrary to,

23   nor an unreasonable application of, that law.  Although the Supreme Court has never

24   directly addressed the question, the Ninth Circuit has stated that "'[f]ederal habeas is

25   available for improper consolidation only if the simultaneous trial 'actually render[ed the]

26   state trial fundamentally unfair and hence, violative of due process.'"  *Park v. California*,

27   202 F.3d 1146, 1149 (9th Cir. 2000) (quoting *Featherstone v. Estelle*, 948 F.2d 1497,

28   1503 (9th Cir. 1991).  A defendant's burden to establish a due process violation in this

regard requires that he demonstrate that actual, and not just potential, prejudice resulted as the events unfolded during the trial. *See Opper v. United States*, 348 U.S. 84, 94-95 (1954); *see also Sandoval v. Calderon*, 241 F.3d 765, 772 (2000). The Ninth Circuit has recognized a "particularly great" risk of prejudice whenever joinder; (1) "allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible," or (2) results in "joinder of a strong evidentiary case with a weaker one." *Sandoval*, 241 F.3d at 772. Finally, in order to obtain habeas relief, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* (citing *Brecht*, 507 U.S. at 623.)

Here, as the state court noted, the charges related to Mendez and Green were very similar in that they both concerned incidents of domestic violence. Moreover, under California state law, prior acts of domestic violence may be admitted to show propensity to commit acts of domestic violence, so long as the probative value outweighs the prejudicial effect. *See* Cal. Evid. Code § 1109(a)(1).[16] Thus, as the state court found, evidence as to both the Mendez and Green counts was cross-admissible and therefore the risk of prejudice from joinder was minimal. Even assuming evidence of the domestic violence counts was not cross-admissible as to the impersonation counts, a violation based on the lack of cross-admissibility of evidence, alone, does not warrant habeas relief. *See Park*, 202 F.3d at 1149-50.

Furthermore, this was not a case where the evidence of one case was substantially weaker than the other. *See Davis v. Woodford*, 384 F.3d 628, 638-39 (9th Cir. 2004) (concluding that denial of motion to sever trial of capital and noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to

---

[16] Section 1109(a)(1) provides that: "[I]n a criminal action in which the [petitioner] is accused of an offense involving domestic violence, evidence of the [petitioner]'s commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

15cv2724 AJB (BGS)

each incident was distinct, and the jury was properly instructed). The strength of both domestic violence cases similarly relied primarily on the testimony of the victim. Moreover, the counts related to impersonation of an officer rested often rested on the testimony of a single eyewitness.

Finally, the jury acquitted Petitioner of several counts related to Green (including violation of a protective order) and the impersonation of an officer counts and child abuse counts. (*See* Lodgment No. 1, vol. 5 at 1115-16.) Thus, the record in this case does not support a conclusion that the joinder, even assuming it was improper, had a substantial and injurious effect or influence on the jury's verdict. *See Park*, 202 F.3d at 1149-50 (finding joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence); *see also Sandoval*, 241 F.3d at 772. Accordingly, given the strength of the cases, the cross-admissibilty of evidence and the lack of prejudice, Kenniston has failed to establish the joinder of the cases violated his due process rights. *See Runningeagle*, 686 F.3d at 776-77; *see also Park*, 202 F.3d at 1149.

Therefore, the Court concludes the state court's denial of his severance claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13. The Court **RECOMMENDS** claim eight be **DENIED**.

### F. Denial of Continuance and Substitution of Counsel (Ground Nine)

In claim nine, Kenniston argues his Sixth Amendment right to counsel was violated when the trial court denied his request to substitute retained counsel for appointed counsel. (Pet., ECF No. 1-2 at 49-69.) Specifically, on the eve of trial, Petitioner sought to have a newly retained counsel substituted for his public defender. The trial court denied the request because the retained counsel required a continuance of at least 45 days to prepare. Kenniston argues the denial of the continuance effectively denied him his right to counsel of his choice. (*See id.* at 49, 68-69.)

/ / /

Kenniston raised this claim in his petition for review to the California Supreme Court and it was denied without comment.  (*See* Lodgment Nos. 6 & 7.)  Thus, this Court "looks through" to the last reasoned decision to address this claim, that of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805-06.  In denying the claim, the appellate court stated:

> Defendant next contends the trial court abused its discretion when, after seven earlier continuances, it denied his request on the date trial was to begin to substitute in new counsel who was unfamiliar with defendant's case.

> A.    Additional Background

> The record shows defendant was indicted by the grand jury in mid-May 2011.  In late June 2011, public defender Jesus Romero was appointed to represent defendant.  On October 12, 2011, the day trial was set to begin, defendant sought and obtained a trial continuance to March 5, 2012.  Thereafter, trial was continued to March 12, 2012.

> On March 8, 2012, the court granted defendant's request to represent himself after it denied his request for new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.  Trial was then set for June 20, 2012.  However, on May 24, 2012, the record shows the court continued defendant's trial to September 10, 2012.  In so doing, the court found that there was nothing "specific about contact with people or potential witnesses that would cause [the court] to believe that [defendant] need[ed] a continuance" and that, when the court previously granted defendant's request to represent himself, it informed him to be ready for trial.  The record shows the court nonetheless granted defendant's request for a continuance, noting it would be the last.

> The record shows defendant on August 7, 2012 requested reappointment of a public defender.  The court granted that request, reappointed Romero to represent defendant and subsequently granted defendant's request to continue the trial to October 22, 2012.

> On October 22, 2012, attorney Mark Edelman specially appeared on behalf of defendant, requesting he be substituted in as defendant's new counsel.  Edelman explained to the court that on October 18, 2012, he had viewed an ad on the internet posted by defendant's friend seeking an attorney to handle defendant's trial.  Edelman noted he had been

65

misinformed that defendant was then representing himself and that there had been no prior continuances in the case, when in fact defendant's trial had been continued at least seven times.

If appointed, Edelman estimated he could be ready to start trial the last week of November 2012. However, after learning the number of proposed witnesses the People intended to call, Edelman revised that estimate during the hearing and said he "maybe" would be ready to start trial in the middle of December.

In denying defendant's motion to substitute in new counsel, the trial court looked at the history of the case and found that if Edelman was appointed, there would be a "great disruption or delay" [footnote omitted] as a result of "new counsel coming up to speed," as Edelman "would not be ready until possibly mid December" (italics added) given the complexity of the case; and that, unlike Edelman, Romero and the People were prepared to start trial that day.

In addition, the court noted that defendant's refusal to cooperate with Romero or make a good faith effort to resolve any potential disagreements with him was not a basis to substitute in Edelman as defendant's counsel. In this regard, Romero noted at the hearing that defendant was choosing not to communicate with him; that defendant had asked him to do things that were "illegal in nature"; and that defendant surmised Romero was "complicit" with the district attorney's office and was "working against him." Romero also indicated that in the past few weeks he had received sporadic phone calls from lawyers responding to the internet ad placed by defendant's friend.

The record further shows that after the trial court refused to substitute Edelman as defendant's counsel, at defendant's request it conducted a *People v. Marsden* hearing and ultimately refused to remove Romero as defendant's counsel and appoint new counsel. [footnote omitted]

B. Guiding Principles

A defendant "who does not require appointed counsel" has the right under the Sixth Amendment "to choose who will represent him [or her]." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) That right, however, is "not absolute" (*People v. Verdugo* (2010) 50 Cal.4th 263, 311) and "can be forced to yield if the court determines the appointment at issue

will result 'in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.]  A trial court has 'wide latitude in balancing the right to counsel of choice against the needs of fairness [citation] and against the demands of its calendar [citation].  The court has, moreover, an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." [Citation.]' (*United States v. Gonzalez-Lopez* [, supra,] 548 U.S. [at p.] 152.)" (*People v. Alexander* (2010) 49 Cal.4th 846, 872.)  A "'disruption of the orderly processes of justice'" may result from a defendant's untimely request to discharge counsel.  (*See People v. Ortiz* (1990) 51 Cal.3d 975, 983.)

C. Analysis

Here, the record shows that when Edelman specially appeared on October 22 after first seeing the internet ad on October 18, 2012, he had virtually no information concerning defendant's case, which, as suggested by our discussion ante concerning severance, involved multiple counts and multiple witnesses spanning the course of years.  During the course of the October 22, 2012 hearing, the record shows Edelman already had revised his forecast of when he possibly could be ready to start trial, stating initially he could be ready at the end of November 2012 but then subsequently revising that estimate to mid-December, "maybe."

In addition, as Edelman himself recognized, he had been given improper information prior to the hearing, inasmuch as the record shows the trial already had been continued at least seven times, even after the court warned there would be no further continuances.  What's more, the record also shows defendant already had been afforded previous opportunities to change representation, including close to or on the eve of trial (with accompanying delays in the start of trial).

Under these circumstances, we conclude the court properly exercised its discretion when it found defendant's eleventh-hour request to substitute in new counsel would have adverse effects on the orderly administration of justice, as it would have prompted yet another delay of trial of at least close to two months -- and likely much longer, given the complexity of the case and given Edelman had virtually no familiarity with the case when he was making (and already revising during the same hearing) his estimate of when he could be ready.  (*See People v. Verdugo*, *supra*, 50 Cal.4th at p. 311 [concluding the trial court acted within its discretion in denying the

defendant's motion to relieve counsel during an evidentiary hearing on the defendant's new trial motion because new counsel not only would have to become familiar with the specific issues raised in such motion but also would have had to study the "entire lengthy trial record, resulting in significant delays"]; *see also People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [concluding the trial court properly rejected the defendant's attempt to discharge counsel and delay the start of trial when that request was made on the date trial was set to begin].)

(Lodgment No. 5 at 28-32.)

It is clearly established under the Sixth Amendment that criminal defendants who have the means to hire their own attorneys generally have a right to such private counsel of their choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (holding that the Sixth Amendment guarantees defendant right to be represented by qualified attorney whom defendant can afford to hire); *see also Powell v. State of Alabama*, 287 U.S. 45, 53 (1932) (stating that "a defendant should be afforded a fair opportunity to secure counsel of his own choice"). However, the right to retained counsel of choice is not absolute and, "if in the sound discretion of the court, the attempted exercise of choice is deemed dilatory or otherwise subversive of orderly criminal process, the judge may compel a defendant to proceed with designated counsel." *Lofton v. Procunier*, 487 F.2d 434, 435-36 (9th Cir. 1973); *see also United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir. 1986) (stating that the right to counsel of choice "must give way where its vindication would create a serious risk of undermining public confidence in the integrity of our legal system").

In general, "[t]rial judges necessarily require a great deal of latitude in scheduling trials." *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 (1983). In that regard, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id*. (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances

present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589-90 (citations omitted); *see also Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008); *Miller v. Blackletter*, 525 F.3d 890, 896-98 (9th Cir. 2008).

When a requested continuance arguably implicates a defendant's Sixth Amendment right to counsel, the court must evaluate the effect of its decision on this fundamental right. *United States v. Garrett*, 179 F.3d 1143, 1145 (9th Cir. 1999) (en banc). The Ninth Circuit has identified three factors courts should consider when deciding whether to permit substitution of retained counsel: (1) whether the defendant had already retained new counsel at the time the request for substitution of attorney is made; (2) whether current counsel was sufficiently prepared and competent to proceed to trial; and (3) the timing of the defendant's request for a change of counsel or a continuance. *Miller*, 525 F.3d at 896-98.

Here, as the state court noted, on October 22, 2012, the day trial was set to begin, attorney Mark Edelman made a special appearance and asked to substitute in as Petitioner's counsel. (Lodgment No. 1, vol. 5 at 1022, Lodgment No. 2, vol. 8 at 600.) Edelman indicated that he had seen a Craigslist ad seeking an attorney for Kenniston on October 18, 2016 – four days before the trial date. (Lodgment No. 2, vol. 8 at 599.) Initially, Edelman estimated he could be prepared for trial by the end of November, but after learning more about the complexity of the case, he revised that estimate, stating that he could be ready by the "middle of December, maybe." (*Id.* at 608.) Romero, Petitioner's appointed counsel, and the prosecutor both indicated that they were prepared to proceed to trial that day, as planned. (*See id.* at 613.)

/ / /

/ / /

/ / /

/ / /

/ / /

69

At the time the request for substitution for counsel was made, the trial date had already been continued at least six times.[17]  It had been over a year since the original October 12, 2011 trial date.  And as noted above, the request for substitution came on the day of trial and Edleman was not prepared to go forward.  By granting the substitution and continuance, the trial would have again been delayed, this time for well over a month, at minimum.  Based on the timing of the request, the number of times the trial had already been delayed, and the additional delay granting the substitution request would cause, the trial court's denial of the continuance was not unreasonable.  *See Morris*, 461 U.S. at 11-12; *see also Houston*, 533 F.3d at 1079 (holding that the trial court acted within its discretion when it denied defendant's motion four days before trial to substitute retained counsel on the sole basis that defendant thought that trial counsel was unprepared); *Miller*, 525 F.3d at 896-98 (habeas petitioner's right to counsel was not violated when he moved for a continuance on the eve of trial, had not yet retained counsel, and appointed counsel was ready to proceed).

Based on the foregoing, the state court's denial of claim nine was neither contrary to, nor an unreasonable application of clearly established law.  *See* 28 U.S.C. § 2254(d);

/ / /

---

[17] Kenniston was indicted on May 23, 2011.  (Lodgment No. 1, vol. 1 at 1.)  He was originally represented by retained counsel.  (*Id.*, vol. 5 at 975-76.)  On June 24, 2011, however, Deputy Public Defender Jesus Romero was appointed.  (*Id.* at 984.)  Trial was first set for October 12, 2011.  That date was continued to March 5, 2012, and then continued again to March 12, 2012.  (*See id.* at 979, 984, 986.)  On March 8, 2012, four days before trial was set to begin, the trial court granted Petitioner's request to represent himself.  (*Id.* at 988, *see also* Lodgment No. 2, vol. 1 at 87-88, 93, 100-01.)  The trial date was then continued to June 20, 2012.  On April 3, 2012, the court denied Kenniston's request for appointment of advisory counsel.  (Lodgment No. 1, vol. 5 at 993, Lodgment No. 2, vol. 2 at 119-23.)  The trial was continued again to September 9, 2012.  (Lodgment No. 2, vol. 4 at 170.)  In granting the continuance, the trial judge told Kenniston it would be the "last continuance."  (*Id.* at 172.)  On August 7, 2012, Kenniston decided he no longer wished to represent himself.  The court reappointed Deputy Public Defender Romero to represent him.  (Lodgment No. 1, vol. 5 at 1011.)  The trial was continued again to October 22, 2012.  (*Id.* at 1014.)

*Williams*, 529 U.S. at 412-13.  Accordingly, the Court **RECOMMENDS** claim nine be **DENIED**.

### G.    Ineffective Assistance of Trial and Appellate Counsels (Ground Ten)

In ground 10, Kenniston argues that both trial counsel and appellate counsel were ineffective, in violation of his Sixth Amendment rights.  (*See* Pet., ECF No. 1-2 at 69-99.) This Court looks through to the last reasoned state court decision to address these claims. *See Ylst*, 501 U.S. at 805-06.  In its opinion denying Kenniston's petition for writ of habeas corpus, California Court of Appeal rejected both claims, stating:

> Finally, Kenniston contends this [sic] trial and appellate counsel were ineffective for failing to raise the issues that Kenniston presents in his writ petition.  To establish ineffective assistance of counsel, petitioner must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)  For the same reasons discussed above, his claims do not have merit and Kenniston does not establish a prima facie case for relief on the basis of ineffective assistance of counsel.

(*See* Notice, ECF No. 19, Ex. C at 65.)[18]

### *1.    Ineffective Assistance of Trial Counsel*

Kenniston argues he was denied his right to effective assistance of counsel when defense counsel failed to adequately object to the prosecution's references to the grand jury proceedings, in contravention of the trial court's in limine ruling.  (Pet., ECF No. 1-2 at 70-75.)  Further, Petitioner claims trial counsel was ineffective in failing to move for a new trial based on the prosecution's purported failure to turn over exculpatory evidence concerning Mendez.  (*Id.* at 76-80.)  Finally, he contends trial counsel failed to

/ / /

---

[18] Kenniston also raised one of his ineffective assistance of trial counsel sub-claims on direct appeal.  That court's opinion is discussed below in section V(G)(1)(a) of this Report and Recommendation.

1    adequately object when jurors reported overhearing two witnesses talking outside the

2    courtroom.  (*Id.* at 80-81.)

3        To establish ineffective assistance of counsel, a petitioner must first show his

4    attorney's representation fell below an objective standard of reasonableness.  *Strickland*

5    *v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made

6    errors so serious that counsel was not functioning as the 'counsel' guaranteed the

7    defendant by the Sixth Amendment."  *Id.* at 687.  Kenniston must also show he was

8    prejudiced by counsel's errors.  *Id.* at 694.  Prejudice can be demonstrated by a showing

9    that "there is a reasonable probability that, but for counsel's unprofessional errors, the

10   result of the proceeding would have been different.  A reasonable probability is a

11   probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Fretwell v.*

12   *Lockhart*, 506 U.S. 364, 372 (1993).  Further, *Strickland* requires that "[j]udicial scrutiny

13   of counsel's performance . . . be highly deferential."  *Strickland*, 466 U.S. at 689.  There

14   is a "strong presumption that counsel's conduct falls within a wide range of reasonable

15   professional assistance."  *Id.* at 686-87.  The Court need not address both the deficiency

16   prong and the prejudice prong if the defendant fails to make a sufficient showing of either

17   one.  *Id.* at 697.

18       "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*,

19   559 U.S. 356, 371 (2010).  "Representation is constitutionally ineffective only if it 'so

20   undermined the proper functioning of the adversarial process' that the defendant was

21   denied a fair trial."  *Strickland*, 466 U.S. at 687.

22                   *a.    Failure to Object to Prosecutorial Misconduct*

23       Kenniston argues trial counsel was ineffective in failing to object each time the

24   prosecutor improperly referred to prior grand jury proceedings.  (Pet., ECF No. 1-2 at 70-

25   75.)

26       Some background is necessary first.  Prior to jury voir dire, defense counsel asked

27   that there be no mention of the "indictment" or "grand jury" proceedings.  (Lodgment

28   No. 2, vol. 9 at 746.)  The prosecutor responded, "I have no problem with the concept of

not mentioning the grand jury. I think it should be referred to as 'prior court proceeding.'" (*Id.* at 746-47.) The court agreed and the verdict forms were changed to remove the word "indictment" and substitute "charging document." (*Id.* at 747-50.) The court stated, "And that way we don't even mention indictment. We don't mention grand jury. And I think that would be preferable." (*Id.* at 750-51.)

On November 6, the second day of testimony, during redirect of prosecution witness Casey Taoian, the prosecutor asked: "Did you speak to a detective from the Chula Vista Police Department in approximately April of 2011, one month prior to the grand jury?" (Lodgment No. 2, vol. 16 at 1429.) Defense counsel objected and requested a side bar. The prosecution moved to strike the statement and the court did so. Defense counsel moved for a mistrial arguing that the prosecution's reference to the grand jury had contaminated the jury. (*Id.* at 1430.) The prosecutor argued it was an inadvertent slip of the tongue and apologized. (*Id.*) He noted further that there was "nothing prejudicial about the fact that a grand jury, at some point, heard testimony." (*Id.* at 1431.) The court agreed it was unintentional and denied the motion for mistrial. The defense chose not have the judge admonish the jury so as to avoid highlighting the reference. (*Id.* at 1432)

The next day, during direct examination of different witness Michael Benavidez, the prosecution again mentioned the grand jury proceedings:

> [Prosecutor]: I would like again, seeing the same page of your grand jury testimony 944, lines 23 through 28, see if reviewing that paragraph of your prior testimony, if that might help you remember what he saw. Does that help you?

(*Id.*, vol. 17 at 1694.) Defense counsel did not object and the court did not sua sponte strike the reference. (*See id.*)

The following day, November 8, 2012, the prosecution again mentioned the grand jury during while attempting to refresh Mendez's recollection with her prior testimony:

/ / /

1    [Prosecutor]:  All right. Now did you testify before the grand jury?

2    [Defense]:    Objection, Your Honor.

3    The Court:    Sustained.

4    [Prosecutor]:  Move to impeach, Your Honor.  Discuss sidebar.

5    (*Id.*, vol. 18 at 1844.)

6    During side bar, it was apparent the prosecutor initially thought defense counsel's

7    objection had to do with his attempt to refresh Mendez's recollection.  (*Id.* at 1845.)

8    After defense moved for a mistrial, the prosecutor apologized and stated that the grand

9    jury reference was an accident.  He suggested the court give a curative instruction.  (*Id.*)

10    The court admonished the prosecutor that he must be "very aware of what you are

11    saying."  (*Id.* at 1845.)  The court then denied defense counsel's motion for mistrial. The

12    defense did not want a curative instruction.  In denying the motion for mistrial, the court

13    reminded the prosecutor that "slips of the tongue cannot be occurring. The more they add

14    up, the more we get to a situation where there may have to be more sanctions."  (*Id.* at

15    1846.)  The court went on to state, "I am again admonishing you if this happens again, I

16    am not sure what my ruling will be at that time.  So it is very serious that you pay close

17    attention."  (*Id.* at 1847-48.)

18    Finally, on November 9, 2012, the prosecution again referred to the grand jury

19    when asking Mendez whether she had been encouraged to tell that truth at trial, even if

20    she had previously lied to the grand jury.  The prosecutor stated:

21    Prosecutor:  Okay.  So you understand you came into the courtroom
before the jury here in order to testify after talking to your attorney, that you
22    were in a position that you could admit to lying before the grand jury or
admit to lying?
23

24

25    (*Id.*, vol. 19 at 2015.)  Defense counsel objected on the grounds the question was

26    compound and the court sustained the objection.  (*Id.*)  The defense did not object to the

27    reference to the grand jury.  (*Id.*)

28    / / /

74

15cv2724 AJB (BGS)

1    Unlike Petitioner's other ineffective assistance of counsel claims contained in

2    claim ten of the federal Petition, Kenniston raised this issue on direct appeal.  He argued

3    that the prosecutor had committed prejudicial misconduct when he referenced the grand

4    jury proceedings and that defense counsel was ineffective in failing to object to two of

5    the prosecutor's grand jury references.  The appellate court found no errors, stating in

6    relevant part:

> It is misconduct for a prosecutor to violate a court ruling by eliciting
> or attempting to elicit inadmissible evidence.  (*People v. Silva* (2001) 25
> Cal.4th 345, 373.)  Nonetheless, a defendant's conviction will not be
> reversed for prosecutorial misconduct unless it is reasonably probable that a
> result more favorable to the defendant would have been reached without the
> alleged misconduct.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133; see
> *People v. Watson* (1956) 46 Cal.2d 818, 836.)
>
> We review the court's ruling on a motion for mistrial based on alleged
> prosecutorial misconduct for an abuse of discretion. (*People v. Ayala* (2000)
> 23 Cal.4th 225, 283.)  "A motion for mistrial is directed to the sound
> discretion of the trial court.  We have explained that '[a] mistrial should be
> granted if the court is apprised of prejudice that it judges incurable by
> admonition or instruction. [Citation.]  Whether a particular incident is
> incurably prejudicial is by its nature a speculative matter, and the trial court
> is vested with considerable discretion in ruling on mistrial motions.'
> [Citation.]"  (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)
>
> We conclude the trial court properly exercised its discretion when it
> refused to grant a mistrial based on the alleged prosecutorial misconduct in
> this case.  The trial court found, as borne out by the record, that the grand
> jury references (when an objection was lodged) were inadvertent and
> unintentional, a finding that is amply supported by the evidence in the
> record.  Indeed, the record shows the grand jury references by the prosecutor
> occurred in passing and ostensibly unknowingly when he was attempting to
> refresh various witnesses' recollection of their prior testimony before the
> grand jury.
>
> In addition, although the court -- at the request of the defense -- ruled
> in limine there should be no reference to an "indictment" or the "grand
> jury," as demonstrated by the record the court also asked the defense to
> provide legal authority to support that ruling.  In our own review of the

voluminous record, it appears no such authority was ever provided. In any event, we were unable to locate independently any authority that referencing the grand jury under circumstances such as here, where a defendant has been charged by indictment, deprives a defendant of the right to a fair trial.

We thus conclude the court properly exercised its discretion in denying defendant's request for a mistrial, after it offered to give what we conclude was a simple curative instruction, because there was no prosecutorial misconduct in this case. [citations omitted]

Moreover, even assuming there was misconduct, we conclude it was not prejudicial. As shown by the record, on two occasions neither the court nor the parties even caught the prosecutor's passing reference to "grand jury," which, as noted, was harmless and, in our view, merely an inadvertent "slip of the tongue." (See *People v. Duff*, *supra*, 58 Cal.4th at p. 568 [noting

a "defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion"].)

That the jury found defendant not guilty of eight counts also supports the finding the jury gave little or no weight to the fact defendant had been indicted by a grand jury. This finding is also supported by the trial court's clear jury instructions that it was up to the jury and the jury "alone to decide what happened, based only on the evidence that has been presented"; that "[n]othing the attorneys say is evidence"; and that, if the court sustained an objection, it was to ignore the question. For this separate and independent reason, we conclude defendant cannot show he was prejudiced by the four grand jury references even assuming those references involved prosecutorial misconduct.

(Lodgment No. 5 at 35-38.)   In a footnote, the appellate court also concluded that there was no ineffective assistance of counsel, stating:

In light of our conclusion there was no prosecutorial misconduct in this case, we also reject defendant's contention he was denied effective assistance of counsel by his counsel's failure to object to two of the four grand jury references by the prosecutor. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053 [noting to establish ineffective assistance, a

defendant must show:  (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) it is reasonably probable that the verdict would have been more favorable absent counsel's error]; see also *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [noting absent a sound legal basis for objection, counsel's failure to object to the admission of evidence cannot establish ineffective assistance of counsel].)

 (Lodgment No. 5 at 37, fn. 9.)

        The state court's denial of the ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established law. Given the state court's conclusion that the prosecutor's isolated references to the grand jury did not amount to misconduct, defense counsel's failure to object to two of the references was not unreasonable.  *See Strickland* 466 U.S. at 688; *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (concluding that federal courts on habeas are bound by state court's interpretation of state law).  Moreover, Petitioner has not shown he was prejudiced by defense counsel's failure to object to the two unchallenged grand jury references.  Furthermore, there is nothing to suggest the jury interpreted the references in an objectionable manner.  Given the benign nature of the references, combined with the fact that they occurred over the course of a nearly three week trial, during which over two dozen witnesses testified regarding 32 counts, there is no reasonable probability that had defense counsel objected, the outcome would have been different.  *See Strickland*, 466 U.S. at 694. Accordingly, Petitioner is not entitled to relief as to this claim.

                    b.    *Failure to Request New Trial Based on <u>Brady</u> Violation*

        Petitioner argues trial counsel was ineffective in failing to move for a new trial based on the prosecution's purported failure to turn over exculpatory evidence concerning Mendez's post-trial statements.  (Pet., ECF No. 1-2. at 76-80.)   He argues, as he does in claim one, that the prosecutor failed to disclose that Mendez had discussed "additional information" with a District Attorney investigator after the trial had ended. (*See id.*)

1    The Ninth Circuit has held that failure to file a motion will not constitute

2 ineffective assistance of counsel unless the trial court would have granted the motion.

3 *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).  As discussed above, in order to

4 establish a *Brady* violation, a petitioner must show (1) the evidence must have been

5 suppressed by the prosecution, either willfully or inadvertently, (2) the withheld evidence

6 must be either exculpatory or impeachment material, and (3) the evidence must be

7 material to the defense.  *Benn*, 283 F.3d at 1052-53 (citing *Bagley*, 473 U.S. at 676, 678).

8 For the reasons discussed above in section V(B)(1) of this Report and Recommendation,

9 trial counsel was not unreasonable for failing to raise a *Brady* claim.  Nothing in the

10 record shows that evidence was withheld by the prosecutor.  And even assuming

11 arguendo that evidence was withheld, Petitioner has not established a "reasonable

12 probability" "sufficient to undermine confidence in the outcome" of the trial.  *Bagley*,

13 473 U.S. at 682; *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007).

14 Therefore, any motion for a new trial based on a *Brady* violation would have been

15 denied.  And as such, Petition has failed to establish that defense counsel's failure to file

16 the motion was unreasonable, or that any such failure was prejudicial.  *See Wilson*, 185

17 F.3d at 990; *see also James*, 24 F.3d at 27 ("Cousel's failure to make a futile motion does

18 not constitute ineffective assistance of counsel.")   The state court's denial of the claim

19 was neither contrary to, nor an unreasonable application of, clearly established law.  *See*

20 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.

21             *c.      Failure to Object to Communication Between Witnesses*

22       Finally, Kenniston argues trial counsel was ineffective when he failed to

23 adequately object when an alternate juror reported overhearing two witnesses talking

24 outside the courtroom.  (Pet., ECF No. 1-2 at 8.)

25       On November 8, 2011, the fourth day of testimony, Alternate Juror No. 1

26 approached the bailiff and asked if it was proper for a witness in the case to be speaking

27 about the case with anyone else.  (Lodgment No. 2, vol. 18 at 1735.)  The attorneys

28 agreed to bring the alternate juror into the courtroom, outside the presence of the other

jurors, in order to get more information.  Alternate Juror No. 1 informed the court that he was sitting outside the courtroom when he saw one witness, ATF Agent Laurence Briggs, speaking to another witness, Michael Benavidez.  (*Id.* at 1736.)  The alternate juror was not close enough to hear their conversation but he overheard the name "Kenniston" mentioned twice.  (*Id.* at 1737.)  The alternate juror then moved away.  He admitted he was not wearing his juror badge at the time because he had forgotten it that day.  (*Id.* at 1739.)  There were no other jurors in the area at the time.  (*Id.* at 1738.)  However, Alternate Juror No. 1 told the court he had mentioned the incident to Alternate Juror No. 3.  (*Id.* at 1744.)  Alternate Juror No. 1 assured the court he could continue to be fair and impartial and follow the court's instruction to base his decision only on the evidence presented at trial.  (*Id.* at 1741-42.)

The trial court then brought in Alternate Juror No. 3.  She stated that Alternate Juror No. 1 had told her he saw two witnesses talking and overhead them mention Kenniston's name.  He told her he assumed they were talking about the case.  (*Id.* at 1745.)  He said he did not hear what they were saying, other than the name.  She assured the trial court that she could set the information aside and judge the case based only on the evidence presented at trial.  (*Id.*)  The court also instructed Alterenate Juror No. 3 not to mention the situation to anyone.  (*Id.* at 1746.)  The prosecutor and defense counsel were given the opportunity to question both Alternate Juror No. 1 and No. 3.  (*Id.* at 1738-41, 1746.)  After the court and attorneys finished questioning the alternates, they moved on to other matters.  Defense counsel made no objections, nor did the prosecutor.  (*See id.* at 1746.)

Kenniston argues defense counsel was ineffective in failing to request that the two witnesses be brought to court to "see what degree of misconduct (witness tampering) was perpetrated by ATF Agent Briggs in influencing Mr. Benavidez's testimony."  (Pet., ECF No. 1-2 at 81.)  Beyond Petitioner's conclusory allegations, however, there is nothing to suggest there was "witness tampering."  Kenniston has no information as to the content of the conversation and as such his allegations that there was evidence of "witness

tampering" are entirely speculative.  Petitioner has therefore failed to establish that defense counsel's failure to object or continue to investigate the matter was unreasonable or prejudicial.  *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (stating that mere conclusions of violations of federal rights in a federal habeas petition without specifics do not state a basis for habeas relief).  Accordingly, the state court's denial of the claim was not unreasonable.  *See Strickland*, 466 U.S. at 686-89.

### 2.    Ineffective Assistance of Appellate Counsel

Lastly, Kenniston argues appellate counsel was ineffective in failing to raise the following claims on appeal: (1) failure to object to an untimely filing by Respondent on appeal; (2) failure to raise a *Brady* claim regarding Mendez's purported statements; (3) failure to raise *Brady* claim regarding Jessica Green's brother; and (4) failure to review the full record.  (*See* Pet., ECF No. 1-2 at 81-90.)

It is clearly established that "[t]he proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)).  A petitioner must first show that his appellate counsel's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  Specifically, a petitioner must show that counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Smith*, 528 U.S. at 285.  He must then show he was prejudiced by counsel's errors.  *Strickland*, 466 U.S. at 694.  To establish prejudice, Kenniston must demonstrate that she would have prevailed on appeal absent counsel's errors.  *Smith*, 528 U.S. at 285.

The Ninth Circuit has observed that:

> [Strickland's] two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence

1   (prong one) and have caused her client no prejudice (prong two) for the
2   same reason - because she declined to raise a weak issue.

3   *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).   An indigent defendant "does not
4   have a constitutional right to compel appointed counsel to press nonfrivolous points
5   requested by the client, if counsel, as a matter of professional judgment, decides not to
6   present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).   Counsel "must be
7   allowed to decide what issues are to be pressed." *Id*.   Otherwise, the ability of counsel to
8   present the client's case in accord with counsel's professional evaluation would be
9   "seriously undermined." *Id*.; *see also Smith v. Stewart*, 140 F.3d 1263, 1274 n. 4 (9th
10  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary,
11  and is not even particularly good appellate advocacy.")   Indeed, appealing every arguable
12  issue would do disservice to a client because it would draw an appellate judge's attention
13  away from stronger issues and reduce appellate counsel's credibility before the appellate
14  court. *Id*. at 1428.

15          a.      *Failure to Object to Untimely Filing by Respondent*

16          First, Kenniston argues appellate counsel was ineffective in failing to object to an
17  untimely brief submitted by Respondent on appeal. (Pet., ECF No. 1-2 at 82-85.)   In
18  support of his claim, Petitioner attaches a letter written by appellate counsel in response
19  to Petitioner's concern regarding Respondent's untimely brief.   In it, appellate counsel
20  stated that "while [Respondent's] brief was technically one day late," it was likely due to
21  an inadvertent calendaring mistake.   Appellate counsel informed Petitioner that "[u]nder
22  these circumstances the Court of Appeal is not going to strike the brief based on a
23  technicality, and I will not be filing a motion with the court." (*See* Pet., ECF No. 1-4, Ex.
24  X-4 at 27.)   As noted above, there can be no ineffective assistance of appellate counsel
25  when counsel elects to forgo raising an issue he or she reasonably believes to be weak.
26  *Miller*, 882 F.2d at 1434.   Here, appellate counsel considered the matter and determined
27  any motion to strike would be denied by the appellate court.   As such appellate counsel's
28  performance was reasonable. *Smith*, 528 U.S. at 285; *see also Jones*, 463 U.S. at 751.

15cv2724 AJB (BGS)

Moreover, because Petitioner has offered nothing other than his own speculation that, had appellate counsel filed such a motion, it would have been granted, Kenniston has not established prejudice. *See id.* Accordingly, Kenniston is not entitled to relief as to this claim. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.

### 2.    *Failure to Raise Brady Claim as to Mendez*

Petitioner argues that appellate counsel was ineffective in failing to raise the *Brady* claim with regard to the purported evidence that Mendez gave "additional information" to the District Attorney's Office after the trial. As discussed in section V(B)(1) of this Report and Recommendation, even assuming the prosecutor failed to turn over evidence, there is nothing to suggest that the information Mendez allegedly provided was exculpatory or impeachment evidence or that it was material. Because the *Brady* claim lacked merit, Petitioner has not shown that appellate counsel's decision not to raise it on appeal was unreasonable, nor has Petitioner's established that had appellate counsel raised the issue, he would have prevailed on appeal. *See Miller*, 882 F.2d at 1434. Therefore the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.

### 3.    *Failure to Raise Claim Jessica Green's Brother-In-Law*

Next, Petitioner argues appellate counsel was ineffective in failing to raise a claim related to Jessica Green's brother. Specifically, Petitioner wrote appellate counsel a letter in which he stated that Green's brother-in-law "works in the appellate office location in San Diego." (Pet., ECF No. 1-4, Ex. X-13 at 59.) He suggests that this could be detrimental to his appeal because he "could have access to both documents and personnel" that might have influence over his case. (*See id.*) In response to Petitioner's letter, appellate counsel stated that he had never encountered such a situation before, and he would "discuss the matter with an attorney at Appellate Defenders, Inc. to see whether they have any insight into such a situation." (*Id.*, Ex. X-14 at 62.)

/ / /

1    Petitioner's claim is conclusory and speculative and does not warrant habeas relief.

2    *See Jones*, 66 F.3d 199, 205.  Appellate counsel's failure to raise any issue related to

3    Petitioner's vague, unsubstantiated claim that Green's brother-in-law might have access

4    to documents on appeal, was neither unreasonable, nor prejudicial.  *See Miller*, 882 F.2d

5    at 1434.  Accordingly, the state court's denial of the claim was neither contrary to, nor an

6    unreasonable application of, clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*,

7    529 U.S. at 412-13.

8                    *4.      Failure to Review the Full Record*

9    Lastly, Petitioner claims appellate counsel was ineffective for failing to review the

10   complete record.  (Pet., ECF No. 1-2 at 88-90.)  Petitioner contends that because the

11   grand jury transcript was admitted as evidence, appellate counsel had a duty to review it.

12   (*Id.* at 89.)    In a letter to Petitioner, appellate counsel noted that he would not be

13   reviewing the grand jury transcripts unless he determined there was a specific need to do

14   so because a grand jury proceeding is not an "appealable proceeding."  (*Id.*, ECF No. 1-4,

15   Ex. X-15 at 65.)   Petitioner's claim is again based on speculative and conclusory

16   allegations.  *See Jones*, 66 F.3d 199, 205.  As appellate counsel noted, under California

17   law, issues regarding the grand jury proceedings are not appealable absent a showing the

18   trial was fundamentally unfair.  *See People v. Pompa-Ortiz*, 27 Cal. 3d 519, 529 (1980).

19   As such, it was not unreasonable for appellate counsel to forgo their review.  *See* Miller,

20   882 F.3d at 1434.  Furthermore, Petitioner fails to establish that, even assuming appellate

21   counsel should have reviewed the transcripts, the failure to do so resulted in prejudice.

22   *Smith*, 528 U.S. at 285.  Kenniston does not specify what claim appellate counsel could

23   have raised (but did not) had he reviewed the grand jury transcripts.  Therefore,

24   Kenniston is not entitled to relief as to this claim.

25   In sum, the state court's denial of Petitioner's ineffective assistance of trial counsel

26   and appellate counsel claims was neither contrary to, nor an unreasonable application of,

27   clearly established law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  The

28   Court therefore **RECOMMENDS** claim ten be **DENIED.**

15cv2724 AJB (BGS)

## VI.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **March 3, 2017**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **March 17, 2017**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  February 10, 2017

Hon. Bernard G. Skomal
United States Magistrate Judge

15cv2724 AJB (BGS)